Ramon P. JOHNSON, Appellant,

v.

UNITED STATES of America et al.

No. 79–1154.

United States Court of Appeals,
District of Columbia Circuit.

Argued Jan. 8, 1980.

Decided May 8, 1980.

Robert H. Reiter, Washington, D. C., for appellant.

H. Lowell Brown, Asst. U. S. Atty., Washington, D. C., with whom Carl S. Rauh, U. S. Atty., Washington, D. C., at the time the brief was filed, and John A. Terry, Asst. U. S. Atty., Washington, D. C., were on brief, for appellees.

Before TAMM and MacKINNON, Circuit Judges, and LOUIS F. OBERDORFER,* United States District Judge for the District of Columbia.

Opinion for the court filed by Circuit Judge TAMM.

TAMM, Circuit Judge:

In 1974 the United States Civil Service Commission (Commission)[1] affirmed a decision by the Treasury Department's Bureau of Alcohol, Tobacco, and Firearms (Bureau or BATF) to remove appellant Ramon P. Johnson from his position as a special agent. The Commission in part grounded its affirmance on hearsay collected by the BATF investigator, and did not assist Johnson with the production of non-Bureau employees to testify in his behalf at the hearing. Johnson sued for reinstatement, but the district court granted the Government's motion for summary judgment. Johnson appeals.

We conclude that the Commission properly considered hearsay along with the other testimony and evidence presented, that substantial evidence supported Johnson's removal, and that the Commission's lack of subpoena power did not deprive Johnson of his due process rights. We therefore affirm.

---

* Sitting by designation pursuant to 28 U.S.C. § 292(a) (1976).

1. In 1978 Congress reorganized management of the civil service, abolished the Civil Service Commission, and created the Office of Personnel Management. Civil Service Reform Act of 1978, Pub.L.No.95–454, 92 Stat. 1111 (codified at 5 U.S.C. §§ 1101–8913 (Supp. II 1978)). The new provisions, however, did not take effect until January of 1979, and thus do not govern the proceedings in this case. *See id.* § 907.

## I. BACKGROUND

On November 1, 1973, BATF Special Agent John P. Rowley notified Special Agent Ramon P. Johnson, a preference eligible employee,[2] of a proposed adverse personnel action based upon certain charges against Johnson. Johnson replied to the allegations, but Rowley decided the evidence supported the adverse action. In early 1974 the Bureau informed Johnson that he would be removed from his position.

Johnson appealed the BATF action to the Commission. After receiving testimony and other evidence, the appeals examiner made several explicit findings of fact. During the afternoon of September 15, 1973, Special Agent Johnson was off duty and driving his personal automobile. He heard a loud noise, as if an object had struck his car. Looking at the point from which the sound seemed to originate, Johnson observed a dark blue 1973 Pinto occupied by four males. The Pinto's occupants gestured at Johnson as their car passed on his right. Johnson suspected that the young men in the Pinto had caused the loud noise and perhaps damaged his car. He pursued the Pinto for several blocks and finally forced it to stop in the right lane.

The appeals examiner also found that despite Johnson's contentions to the contrary, the weight of the evidence showed Johnson next got out of his automobile with his privately owned revolver in hand and approached the Pinto. The Pinto's driver first threw his car into reverse, then headed forward. As the Pinto passed, Johnson fired. The bullet struck the Pinto in the left rear quarter panel.[3] The appeals examiner concluded that Johnson was not in any danger of being struck by the Pinto at the time he fired his weapon.

Having made these findings, the appeals examiner affirmed BATF's removal of Johnson from his position. She agreed with BATF that Johnson's behavior constituted conduct unbecoming a BATF employee, was not in the public interest, reflected discredit to the Bureau's public image and that consequently, Johnson's removal would promote the efficiency of the Bureau. The Appeals Examining Office affirmed the examiner's decision, as did the Commission's Appeals Review Board.

Johnson filed suit in the United States District Court for the District of Columbia, seeking reinstatement in his job position. On October 24, 1978, Judge Barrington D. Parker granted the Government's motion for summary judgment. Johnson appeals.

## II. SUBSTANTIAL EVIDENCE

### A. *Standard of Review*

■ We must affirm Johnson's removal if we find that there was substantial evidence to support the BATF action and if we determine that the Commission was not arbitrary or capricious in some other respect. *Polcover v. Secretary of the Treasury*, 477 F.2d 1223, 1226–27 (D.C.Cir.), *cert. denied*, 414 U.S. 1001, 94 S.Ct. 356, 38 L.Ed.2d 237 (1973). "Substantial evidence" is " 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion,' " *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 1427, 28 L.Ed.2d 842 (1971) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229, 59 S.Ct. 206, 216, 83 L.Ed. 126 (1938)), that is, " 'enough [evidence] to justify, if the trial were to a jury, a refusal to direct a verdict,' " *Illinois Central Railroad v. Norfolk & Western Railway*, 385 U.S. 57, 66, 87 S.Ct. 255, 260, 17 L.Ed.2d 162 (1966) (quoting *NLRB v. Columbian Enameling & Stamping Co.*, 306 U.S. 292, 300, 59 S.Ct. 501, 505, 83 L.Ed. 660 (1939)). *Accord, Harborlite Corp. v. ICC,*

---

**2.** Johnson was a "preference eligible employee" by virtue of his nonprobationary status and prior military service. *See* 5 U.S.C. §§ 2108, 7511(1) (1976) (current version at 5 U.S.C. §§ 2108, 7511(a)(1)(B) (Supp. II 1978)).

**3.** According to expert testimony at the Commission hearing, Johnson's bullet entered the Pinto from behind and to the left. Commission Hearing Transcript (Tr.) at 9. A photograph of the automobile taken after the shooting indicates that the bullet penetrated the body just above and aft of the gas cap, at approximately the same height as the driver's door handle. *See* Commission Record (Record), vol. II, at 256 (exhibit 8).

613 F.2d 1088, 1093 n.10 (D.C.Cir. 1979). Despite the profligate duplication of Judge Parker's labors, we review the Commission's decision, not the district court's. Though the district court has already inspected the agency record and found that the evidence supports the Commission's conclusion, we must do so again and make an independent judgment. *Polcover v. Secretary of the Treasury*, 477 F.2d at 1226 & nn.5–6.[4]

## B. Admissibility and Weight of the Hearsay Evidence

Two witnesses other than Johnson himself testified before the Commission's appeals examiner at Johnson's hearing: Special Agent Rowley, Johnson's supervisor, and Special Agent Robert M. Potter, who investigated the incident. Rowley explained BATF's firearms policy and detailed how he decided to remove Johnson. Potter reported on his inspection of the damaged Pinto and gave his conclusions concerning the bullet's trajectory. The appeals examiner also relied upon statements Potter had collected from the Pinto's occupants and from disinterested witnesses. Agent Potter included these statements in his investigative reports, which he later adopted as part of his hearing testimony. Commission Hearing Transcript (Tr.) at 10. Johnson's counsel conceded during the Commission hearing that the statements had become part of the record. *Id.* at 113. Nevertheless, Johnson objects to the Commission's use of these statements, which he characterizes as inadmissible hearsay that cannot constitute substantial evidence.

█ It has long been settled that the factfinder in an administrative adjudication may consider relevant and material hearsay. *Montana Power Co. v. FPC*, 185 F.2d 491, 498 (D.C.Cir.1950), *cert. denied*, 340 U.S. 947, 71 S.Ct. 532, 95 L.Ed. 683 (1951). *See Richardson v. Perales*, 402 U.S. 389, 402, 91 S.Ct. 1420, 1427, 28 L.Ed.2d 842 (1971); *Opp Cotton Mills, Inc. v. Administrator of*

*the Wage and Hour Division of the Department of Labor*, 312 U.S. 126, 155, 61 S.Ct. 524, 537, 85 L.Ed. 624 (1941); *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229–30, 59 S.Ct. 206, 216–17, 83 L.Ed. 126 (1938). Thus in *Brown v. Gamage*, 377 F.2d 154 (D.C.Cir.), *cert. denied*, 389 U.S. 858, 88 S.Ct. 103, 19 L.Ed.2d 125 (1967), we affirmed the involuntary discharge of an Air Force officer based upon statements that the Air Force had taken from five witnesses. *See id.* at 158. *Accord, Marvin Tragash Co. v. United States Department of Agriculture*, 524 F.2d 1255, 1258 (5th Cir. 1975); *Brown v. Macy*, 340 F.2d 115, 117 (5th Cir. 1965). Congress never instructed the Commission to follow the rules of evidence as applied in the courts. Indeed, the Commission's regulations, specifically 5 C.F.R. § 772.305(c)(4) (1974), authorized introduction of statements from witnesses. *See Pascal v. United States*, 543 F.2d 1284, 1289, 211 Ct.Cl. 543 (1976); *Jacobowitz v. United States*, 424 F.2d 555, 559–60, 191 Ct.Cl. 444, 448–49 (1970). At the Commission hearing, Johnson's counsel himself moved the admission of a character witness's statement in lieu of the witness's testimony in person. Tr. at 243.

Not only is hearsay admissible, but under the appropriate circumstances, it may constitute substantial evidence. At one time federal courts adhered to the so-called "residuum rule": hearsay alone could not support an agency conclusion; some "residuum" of evidence of a type admissible in a jury trial also had to be present. *School Board v. HEW*, 525 F.2d 900, 905 (5th Cir. 1976). *See* 2 K. Davis, Administrative Law Treatise § 14.10 (1958). This rule no longer controls. We have rejected a per se approach that brands evidence as insubstantial solely because it bears the hearsay label. *See Klinestiver v. Drug Enforcement Administration*, 606 F.2d 1128, 1129 (D.C. Cir.1979). Instead, we evaluate the weight each item of hearsay should receive according to the item's truthfulness, reasonable-

---

4. Albeit too late to affect these proceedings, Congress has corrected this waste of judicial resources by restructuring review of civil service actions. Civil Service Reform Act of 1978, Pub.L.No.95–454, § 205, 92 Stat. 1111 (codified at 5 U.S.C. § 7703(b) (Supp. II 1978)). The new statute provides for appeals directly to the Court of Claims or to a court of appeals.

ness, and credibility. 4 B. Mezines, J. Stein & J. Gruff, Administrative Law § 26.02, at 26–16 to 17 (1979). *See, e. g., Richardson v. Perales*, 402 U.S. 389, 402–06, 91 S.Ct. 1420, 1427–29, 28 L.Ed.2d 842 (1971); *School Board v. HEW*, 525 F.2d at 906; K. Davis, Administrative Law of the Seventies § 14.-11 (1976 & Supp.1978).

■ Several factors suggest that the statements made by Gregory S. Prendable, Mrs. Daren Ryan, and M. Theresa Fisher, Commission Record (Record), vol. II, at 272–74, are highly probative. *See Richardson v. Perales*, 402 U.S. at 402–06, 91 S.Ct. at 1427–1429 (standard for determining weight to be accorded hearsay); *School Board v. HEW*, 525 F.2d at 906 (same). First, all three out-of-court declarants were disinterested witnesses to the event. Second, their three accounts are essentially consistent.[5] Third, Johnson's counsel had access to the three statements before the agency's hearing.[6] Though he could not have compelled the eyewitnesses' presence at the hearing for cross-examination, *see* pp. 193–195 *infra*, his counsel could have interviewed them to obtain his own statements, either for additional information or impeachment. In light of these circumstances, the Commission concluded correctly that the statements could be relied upon as

evidentiary support for the matters they addressed.

## C. The Evidence Before the Commission

■ A survey of the evidence before the appeals examiner reveals that the Commission had a sufficient basis for upholding Johnson's removal. Johnson, suspecting that the Pinto's occupants had damaged his car, did not report the incident to the proper authorities. Instead, he took the law into his own hands. By his own admission he pursued the Pinto through traffic and induced it to stop. Tr. at 190–91. He thereby exacerbated what would otherwise have been a minor occurrence. He increased, rather than minimized, the danger to himself, to the Pinto's occupants, and to innocent members of the public.

More important, Johnson admittedly fired his revolver at the Pinto, *id.* at 202, and the evidence shows he did not comply with the Bureau's policies when he took that action.[7] The BATF Criminal Enforcement Manual directs that firearms are to be used "only as a last resort" to prevent loss of life or serious bodily injury. Bureau of Alcohol, Tobacco & Firearms, Criminal Enforcement Manual § 3132.2(1) (July 1, 1973), *reprinted in* Record, vol. II, at 248, 249.[8]

---

5. The only genuine difference between them concerns whether Johnson had his gun in hand when he first approached the Pinto. Although Prendable stated that he observed the gun, Record, vol. II, at 272, Ryan and Fisher could not recall having seen it until Johnson fired at the Pinto. *Id.* at 273 (Ryan); *id.* at 274 (Fisher). The appeals examiner reconciled this disagreement between the statements by reasoning that the small revolver could fit into Johnson's hand without being visible from all perspectives. *Id.*, vol. I, at 60.

6. Prior to the hearing Johnson analyzed the statements as part of his reply to Agent Rowley's charges, *id.* at 173–76, listed the statements as exhibits to his response, *id.* at 157, received an invitation to view all of the adverse evidence, including the statements, *id.* at 132, and received copies of the statements, both in their original and in affidavit form, *see id.* at 122, 131.

7. Johnson does not dispute that the Bureau's firearm regulations apply to BATF special agents at all times, regardless of whether the

agent is on or off duty. *See* Tr. at 177. Johnson's counsel himself applied the same regulations to Johnson in an attempt to show that his actions were correct. *Id.* at 65–66.

8. Section 3132.2(1) of the Criminal Enforcement Manual provides:

Firearms must not be used as instruments of investigation or enforcement. Promiscuous flourishing of firearms is prohibited. Firearms for special agents' use are defensive, not offensive, weapons. While it is not intended that special agents should remain passive and jeopardize their lives or the life of an associate when danger threatens, it is intended that extreme caution and cool deliberation should control their actions. Firearms will be used only as a last resort when in the considered opinion of the officer there is danger of loss of life or serious bodily injury to himself or to another person, and not otherwise.

a. Firing a weapon should be with the intent of rendering the person at whom the weapon is fired incapable of continuing the activity prompting the agent to shoot.

Due to the risk of ricochet causing injury to innocent parties, the manual discourages firing at a moving vehicle for the purpose of bringing it to a halt. *Id.* § 3132.2(1)(c), *reprinted in* Record, vol. II, at 249. Firing at a fleeing person is restricted to circumstances in which the officer "has reasonable cause to believe that the fleeing person poses an immediate threat to the life of the officer or others." *Id.* § 3132.2(1)(d), *reprinted in* Record, vol. II, at 249–50.

At the time of the shooting, Johnson was not in danger of being struck by the Pinto. Agent Potter's testimony and photographs establish that Johnson fired the revolver from behind and from the left of the Pinto; that is, the Pinto had already passed Johnson when he fired his weapon. Tr. at 9 (testimony of Special Agent Potter); Record, vol. II, at 256 (exhibit 8). *See* note 3 *supra.* Although Johnson contends in his brief that he was standing on the road's median strip and that it was after the Pinto's incursion onto the median that Johnson pulled the trigger, Brief for Appellant at 4–5, the weight of the evidence is to the contrary. Johnson's report of the incident to his superior, a report made only two days after the event, recounts that Johnson "jumped aside" from the oncoming Pinto before he fired, and only then did the Pinto strike the median strip. Memorandum from Ramon P. Johnson to BATF Special Agent in Charge (Sept. 17, 1973), *reprinted in* Record, vol. II, at 293, 293. All three disinterested witnesses agree that Johnson was not standing on the median strip when he fired and that the Pinto was beyond Johnson when it ran onto the median. All three also place the Pinto a considerable distance from Johnson when it passed by him. Their recollection is that Johnson was

not in danger of being hit by the fleeing Pinto, nor did it appear that the Pinto's driver was attempting to him him. *See* Record, vol. II, at 272 (Prendable); *id.* at 273 (Ryan); *id.* at 274 (Fisher).

Not only did Johnson risk considerable danger to innocent parties who might have been struck by ricocheting bullets, but Johnson testified that he actually *intended* a fatal result. He conceded that he aimed at the Pinto's driver, Tr. at 229, that he was trying to kill the driver, *id.* at 241, and that he missed the driver only because his aim did not account for the Pinto's speed and direction, *id.* at 232. This, too, violated the BATF firearms policy. Johnson had no reason to believe that the fleeing occupants of the Pinto immediately threatened his life or the life of someone else.

Considering the testimony, documents, photographs, and statements before the appeals examiner, we are convinced that a reasonable mind might accept the evidence as adequate to show Johnson forced the Pinto to the side of the road and fired his weapon at it without sufficient justification. Johnson's behavior unnecessarily endangered property and human life and demonstrated a temperment inimical to his position as a special agent.

■ We recognize that as a preference eligible employee, Johnson could be dismissed only for "such cause as will promote the efficiency of the service." 5 U.S.C. § 7512(a) (1976) (current version at 5 U.S.C. § 7513(a) (Supp. II 1978)). The agency must make some explanation of the deleterious effects the employee's actions have had or will have in the future. *Norton v. Macy*, 417 F.2d 1161 (D.C.Cir.1969). Pro-

---

b. Warning shots should be fired only when the expected result is to avoid the necessity for firing directly at a person, and there is negligible danger of injury to an innocent party.

c. Firing at a moving vehicle with the intent of rendering it incapable of being operated poses a formidable danger to innocent parties. The possibility of a ricochet is greatly increased when the target is a car body or a spinning tire. Utmost caution must be exercised when considering such action.

d. Firing at a fleeing person can be assumed justifiable only when the officer has reasonable cause to believe that the fleeing person poses an immediate threat to the life of the officer or others.

Bureau of Alcohol, Tobacco & Firearms, Criminal Enforcement Manual § 3132.2(1) (July 1, 1973), *reprinted in* Record, vol. II, at 248, 249–50.

moting the efficiency of the service, however, "is not restricted to testing the employee's work-efficiency or his performance on the job." *Hoover v. United States*, 513 F.2d 603, 606, 206 Ct.Cl. 640 (Ct.Cl.1975). In *Hoover*, for example, the Court of Claims affirmed the dismissal of an Internal Revenue Service tax technician who had claimed deductions on his personal federal income tax returns that he knew, or ought to have known, he was not entitled to claim. The technician had acted on his own time and with respect to his own affairs, yet the court reasoned that the Internal Revenue Service had a justifiable interest in its image of honesty and integrity, and that Hoover had done exactly what he had been employed to prevent. *See id.* at 607–08.

The Bureau of Alcohol, Tobacco, and Firearms employed Ramon Johnson as a criminal investigator. Whether on duty or off, a law enforcement officer must maintain a high standard of conduct. Entrusted with special authority and armament, he is expected to remain calm under pressure. The capacity to think rationally and intelligently despite adverse circumstances is more than a desirable trait; its presence could mean life instead of death for the officer himself, his fellow officers, and innocent bystanders. Furthermore, a law enforcement officer must obey the letter of the law he has sworn to uphold. His behavior must be an example for the rest of society.

Johnson's conduct was more than just unbecoming a BATF special agent, adverse to the public interest, and harmful to the Bureau's public image. Johnson's removal involved more than just a fear he might embarrass the Bureau in the future. *See Norton v. Macy*, 417 F.2d 1161, 1167 (D.C.Cir. 1969). The nature of an agent's work leaves little room for the kinds of error exhibited in this incident. We would be acting unreasonably and irresponsibly in our own right if we were to compel BATF to bear the risk that Johnson might again prove incapable of controlling his use of lethal force. We therefore conclude that the Commission properly determined that Johnson's removal promoted the efficiency of the service.[9]

### III. DUE PROCESS

Johnson alleges that the Commission's failure to issue subpoenas or otherwise assist in the production of witnesses deprived him of his rights to procedural due process as guaranteed by the fifth amendment. We conclude that the Commission's statutory and regulatory authority did not provide for the subpoenas Johnson requested, and that this lack of authority did not deprive Johnson of his rights.

Subpoena power is not an intrinsic feature of the administrative process, and courts cannot engraft subpoena authority onto an agency's charter from Congress. *Hyser v. Reed*, 318 F.2d 225, 239–40 (D.C. Cir.), *cert. denied*, 375 U.S. 957, 84 S.Ct. 446, 11 L.Ed.2d 315 (1963). The Civil Service Commission had no statutory obligation to examine witnesses or hold an adversary hearing, much less issue a subpoena. *See* 5 U.S.C. §§ 7501(b), (c), 7512(b) (1976) (current version at 5 U.S.C. § 7513(b), (c) (Supp. II 1978)). *See also* R. Vaughn, Principles of Civil Service Law § 5.4, at 5–47 (1976). As we stated in *Deviny v. Campbell*, 194 F.2d 876, 880 (D.C.Cir.), *cert. denied*, 344 U.S. 826, 73 S.Ct. 27, 97 L.Ed. 643 (1952), "[t]he Commission cannot confer upon itself the power of subpoena in the absence of a statute requiring it to hold hearings of the type involving subpoenas."

Though the Commission's regulations, consistent with the lack of statutory subpoena authority, only required BATF to produce any of its own employees Johnson wished to have testify, *see* 5 C.F.R. § 772.-

---

9. Johnson directs our attention to the failure of the appropriate civil authorities to bring criminal charges. A criminal prosecution, however, differs considerably from an adverse personnel action. *See Polcover v. Secretary of the Treasury*, 477 F.2d 1223, 1231–32 (D.C.Cir.), *cert.* denied, 414 U.S. 1001, 94 S.Ct. 356, 38 L.Ed.2d 237 (1973). The decision not to prosecute is often complex, turning on many factors other than culpability, and a federal agency's decision to remove an employee can be lawful without a determination of criminal guilt.

305(c)(2) (1974), Johnson sought production of the three disinterested witnesses, all of whom were not government employees. The Commission, being powerless to assist, refused Johnson's request. Johnson now contends that this refusal infringed upon his due process rights.

■ Because Johnson could not be dismissed except for cause, he clearly had a property interest protected by due process. *See Board of Regents v. Roth*, 408 U.S. 564, 576–78, 92 S.Ct. 2701, 2708–09, 33 L.Ed.2d 548 (1972). *See also Bishop v. Wood*, 426 U.S. 341, 343–47, 96 S.Ct. 2074, 2076–2078, 48 L.Ed.2d 684 (1976); *Arnett v. Kennedy*, 416 U.S. 134, 164–67, 94 S.Ct. 1633, 1649–50, 40 L.Ed.2d 15 (1974) (Powell, J., concurring in part and concurring in the result in part); *id.* at 177–86, 94 S.Ct. at 1655–60 (White, J., concurring in part and dissenting in part); *id.* at 207–11, 94 S.Ct. at 1670–72 (Marshall, J., dissenting).[10] The mere presence of a right to due process, however, does not mean that Johnson's constitutional arguments must prevail, for the fifth amendment only requires that a person receive his "due" process, not every procedural device that he may claim or desire. Under the line of cases beginning with *Goldberg v. Kelly*, 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970), our determination of what process is due depends upon an analysis and weighing of three factors: the nature of the benefit or status of which the individual is being deprived; the need for the government to act efficiently and expeditiously in terminating this type of benefit or status; and the extent to which the decisionmaking process would be aided by the presence of the procedural safeguard that the individual seeks. *See Mathews v. Eldridge*, 424 U.S. 319, 334–35, 96 S.Ct. 893, 902–903, 47 L.Ed.2d 18 (1976). *See also Vitek v. Jones*, 445 U.S. 480, 495–496, 100 S.Ct. 1254, 1264–1265, 63 L.Ed.2d 552 (1980); *Goss v. Lopez*,

419 U.S. 565, 579–84, 95 S.Ct. 729, 738–741, 42 L.Ed.2d 725 (1975). *See generally* 2 K. Davis, Administrative Law Treatise § 13:12 (2d ed. 1979).

■ Applying these three factors to the issue before us, we conclude that due process does not mandate the availability of compulsory process to defend against a dismissal from government employment. To be sure, the interest of the employee in retaining his status is significant, and certain procedural safeguards may well be constitutionally required. Moreover, an employment termination case often revolves around determinations of fact, determinations that would be less prone to error if live witnesses could be produced by the employee. On the other hand, decisions to dismiss an employee are discretionary to a significant extent, and to this extent the presence or absence of specific factual evidence may not control on the dismissal question. The criteria considered when assigning weight to hearsay evidence, *see* p. 191 *supra*, further undercut the need for direct testimony, inasmuch as hearsay can be relied upon only if it is highly probative. Finally, the government must be allowed to process efficiently the dismissal of employees who should no longer be in the government service. As Justice Powell noted in *Arnett v. Kennedy*, 416 U.S. 134, 94 S.Ct. 1633, 40 L.Ed.2d 15 (1974):

In the present case, the Government's interest, and hence the public's interest, is the maintenance of employee efficiency and discipline. Such factors are essential if the Government is to perform its responsibilities effectively and economically. To this end, the Government, as an employer, must have wide discretion and control over the management of its personnel and internal affairs. This includes the prerogative to remove employees whose conduct hinders efficient operation

---

10. Due to the stigma that may attach to a person dismissed for conduct such as that alleged here, Johnson may also have had a liberty interest protected by due process. *See Bishop v. Wood*, 426 U.S. 341, 347–49, 96 S.Ct. 2074, 2078–79, 48 L.Ed.2d 684 (1976). Because we have found that Johnson had a property interest protected by due process, and because our due process analysis and result would not differ if we found that a liberty interest existed, we need not reach the issue of whether Johnson also had a liberty interest cognizable under the fifth amendment's due process clause.

and to do so with dispatch. Prolonged retention of a disruptive or otherwise unsatisfactory employee can adversely affect discipline and morale in the work place, foster disharmony, and ultimately impair the efficiency of an office or agency.

*Id.* at 168, 94 S.Ct. at 1651 (Powell, J., concurring in part and concurring in the result in part). To clutter the dismissal procedure with the potentially extensive, costly, intrusive, and time-consuming use of subpoenas might unduly protract government decisionmaking and hamper the government's ability to remove personnel who do not belong on the government payroll. In consideration of all these factors, we do not believe that the Constitution requires us to overturn the judgment of Congress that the Commission should not have the power to issue subpoenas. *Cf. Arnett v. Kennedy*, 416 U.S. 134, 94 S.Ct. 1633, 40 L.Ed.2d 15 (1974) (due process does not require a full evidentiary hearing *prior* to the removal of a nonprobationary government employee).[11]

### IV. CONCLUSION

Substantial evidence supported Johnson's removal from his position as a BATF criminal investigator, and the Civil Service Commission accorded Johnson the full measure of his constitutional rights.[12] Judge Parker's decision granting summary judgment to the Government is therefore

*Affirmed.*

[11]. Our due process holding is consistent with pre-*Goldberg* Supreme Court authority. *See Brinkley v. Hassig*, 282 U.S. 800, 51 S.Ct. 39, 75 L.Ed. 720, *dismissing appeal from* 130 Kan. 874, 289 P. 64 (1930); *Missouri ex rel. Hurwitz v. North*, 271 U.S. 40, 42, 46 S.Ct. 384, 385, 70 L.Ed. 818 (1926); *Low Wah Suey v. Backus*, 225 U.S. 460, 470–71, 32 S.Ct. 734, 736, 56 L.Ed. 1165 (1912); W. Gellhorn, C. Byse & P. Strauss, Administrative Law 680 (7th ed. 1979). *Cf. Williams v. Zuckert*, 372 U.S. 765, 83 S.Ct. 1102, 10 L.Ed.2d 136 (1963) (discharging agency may have some duty to assist when desired witnesses are employees of the agency). *See also Ubiotica Corp. v. FDA*, 427 F.2d 376 (6th Cir. 1970).

[12]. Having found no deprivation of due process, we need not discuss the possibility of a cause of action under *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971). We have carefully considered Johnson's racial discrimination claims under 42 U.S.C. §§ 1981, 1983, and 2000e–2 (1976) and find them to be wholly without merit.