590 F.2d 852
 Charles V. HALLENBECK, Jr., and Clyde A. Hallenbeck, as
Individuals, as Trustees, and as Members of a
Class, Plaintiffs-Appellants,
v.
Thomas KLEPPE, Secretary of the Interior, and Earl Butz,
Secretary of Agriculture, Defendants-Appellees.
 No. 76-2035.
 United States Court of Appeals,
Tenth Circuit.
 Argued March 14, 1978.
Decided Jan. 18, 1979.
 
 Marvin B. Woolf, Boulder, Colo., for plaintiffs-appellants.
 Robert L. Klarquist, Dept. of Justice, Washington, D.C. (Peter R. Taft, Asst. Atty. Gen., Washington, D.C., James L. Treece, U.S. Atty., Jerre W. Dixon, Asst. U.S. Atty., Denver, Colo., and Edmund B. Clark, Dept. of Justice, Washington, D.C., were on the brief), for defendants-appellees.
 Before HOLLOWAY, BARRETT and McKAY, Circuit Judges.
 HOLLOWAY, Circuit Judge.
 
 
 1
 The plaintiffs-appellants Hallenbeck and others appeal a district court summary judgment in favor of the government. The controversy began with an administrative contest of seven placer mining claims located before 1955[1] by the late C. V. Hallenbeck, Sr.,[2] in the San Isabel National Forest in Lake County, Colorado. The government's contest proceeding resulted in a decision by an administrative law judge against the contestees, and his decision was in turn affirmed by the Interior Board of Land Appeals. 21 IBLA 296. The instant judicial review followed.
 
 
 2
 The government initiated the contest proceeding in December 1970. After a two-day hearing in 1974 the administrative law judge declared the seven claims invalid. In July 1975 the Hallenbecks commenced this suit in the district court seeking, Inter alia, to enjoin the government from removing sand and gravel, cutting timber, building roads and doing other work on the claims in connection with the Bureau of Reclamation's Frying Pan-Arkansas Project. An appeal from the administrative law judge's decision was completed, and the Interior Board of Land Appeals affirmed the ruling that the claims were invalid. The complaint in the district court was then amended to challenge that decision. The district court limited its consideration to judicial review of the administrative decision pursuant to 5 U.S.C. §§ 702, et seq.
 
 
 3
 The government moved for summary judgment on the administrative record. In September 1976 the district court entered its findings and conclusions, holding that the findings of the Department of the Interior of invalidity of the claims were supported by substantial evidence, and were neither arbitrary, capricious nor otherwise not in accordance with the law.[3] The court's order dismissed the action and this appeal followed.
 
 
 4
 For reversal the plaintiffs-appellants claim that there was error in that: (1) the government was in bad faith in its manner of conducting investigation of the claims and delaying filing of the contest, so that estoppel and laches apply against the government; (2) the plaintiffs had presented evidence in the administrative hearing demonstrating that a valuable marketable discovery had been made on the claims, satisfying their burden of proving the validity of the claims; (3) the government failed to carry its burden of establishing that the Hallenbeck placer claim was invalid; (4) the district court erred as a matter of law when it held that a mineral claimant cannot "hoard" valuable minerals such as the plaintiffs' sand and gravel; (5) the court erred in not considering valuable mineral deposits on adjoining property; and (6) the court erred in not granting a trial De novo to the plaintiffs since the administrative law judge had been mistaken as a matter of law in holding that sand and gravel deposits will not serve to support a discovery required under the mining laws.
 
 
 5
 The laches and estoppel issues.
 
 
 6
 First, we treat the plaintiffs' contention that the government was in bad faith in its investigation and delay of the contest proceeding, in thus delaying the hearing until after the death of C. B. Hallenbeck, Sr., and in not offering its own evidence as to the value of sand and gravel it took from the claims for use in the Frying Pan-Arkansas Project. More specifically, plaintiffs argue that although the government knew about their claims for many years the contest proceeding was delayed until after the important testimony of Mr. C. B. Hallenbeck, Sr., was unavailable, along with other evidence of gold on the claims which was lost or stolen before the date of trial. (Brief for Plaintiffs-Appellants, 4-5).
 
 
 7
 We feel that the estoppel and laches defenses were not shown to have any merit on the basis of this record. There was no proof of any positive acts or representations made by government agents on which the plaintiffs justifiably relied in losing any evidence, and there was no showing of any intentional delay until Mr. Hallenbeck's testimony or other proof was unavailable. Furthermore, there was no showing of lack of diligence on the government's part and of prejudice to the plaintiffs, both of which are necessary as a foundation for a laches defense. See Roberts v. Morton, 549 F.2d 158, 163-64 (10th Cir.), Cert. denied, 434 U.S. 834, 98 S.Ct. 121, 54 L.Ed.2d 95. Arguments along these lines are made, but they are not demonstrated in the evidence of record. Thus, even assuming some relaxation of the general rule that the government is not subject to such defenses of laches or estoppel in cases involving the public lands, See United States v. California, 332 U.S. 19, 39-40, 67 S.Ct. 1658, 91 L.Ed. 1889, these defenses were not established in the record.
 
 
 8
 In sum, we find no merit in the plaintiffs' assertions of bad faith on the
 
 
 9
 part of the government, or in the defenses of laches and
 
 
 10
 estoppel. The sufficiency of the evidence to
 
 
 11
 support the administrative findings and
 
 
 12
 related issues.
 
 
 13
 Second, we will discuss plaintiffs' contention that the administrative rulings were in error because the plaintiffs had presented evidence at the administrative hearing demonstrating that a valuable marketable discovery had been made on the claims, which satisfied their burden of proving the validity of the claims.
 
 
 14
 The claimant rather than the government is the proponent of a ruling that he has complied with applicable mining laws. The government must go forward with sufficient evidence to establish Prima facie the invalidity of contested claims, and the burden then shifts to the claimant to show by a preponderance of the evidence that his claim is valid. United States v. Zweifel, 508 F.2d 1150, 1157 (10th Cir.), Cert. denied, 423 U.S. 829, 96 S.Ct. 47, 46 L.Ed.2d 46. To meet his burden the claimant must show that the discovered mineral deposits are of such a character that "a person of ordinary prudence would be justified in the further expenditure of his labor and means, with a reasonable prospect of success, in developing a valuable mine, . . ." Castle v. Womble, 19 L.D. 455, 457. The Supreme Court has approved this prudent-man test for some time. See United States v. Coleman, 390 U.S. 599, 600, 88 S.Ct. 1327, 20 L.Ed.2d 170; Roberts v. Morton, supra, 549 F.2d at 163.
 
 
 15
 In Coleman the Court discussed the required showing of "valuable mineral deposits" under 30 U.S.C. § 22 as applied to more common solid materials. The Court upheld a ruling of the Secretary of the Interior that it must be shown that the mineral can be "extracted, removed and marketed at a profit" the so-called "marketability test." 390 U.S. at 600, 88 S.Ct. at 1329. The Court rejected the objection that the marketability test imposes a different and more onerous standard on claims for minerals of widespread occurrence than for rarer minerals which have generally been dealt with under the prudent-man test, stating (id. at 603, 88 S.Ct. at 1330-1331):
 
 
 16
 As we have pointed out above, the prudent-man test and the marketability test are not distinct standards, but are complementary in that the latter is a refinement of the former. While it is true that the marketability test is usually the critical factor in cases involving nonmetallic minerals of widespread occurrence, this is accounted for by the perfectly natural reason that precious metals which are in small supply and for which there is a great demand, sell at a price so high as to leave little room for doubt that they can be extracted and marketed at a profit.
 
 
 17
 We note that Congress withdrew common varieties of sand and gravel from further location under the mining laws as of July 23, 1955. See 30 U.S.C. § 611 (1970). Thus, mineral claims founded on these materials must meet the marketability test outlined above as of that date.[4] Melluzzo v. Morton, 534 F.2d 860, 861-62 (9th Cir.).
 
 
 18
 As to gold, the government's evidence was presented by Mr. Roberts, a mineral examiner with the Forest Service. On different occasions he took mineral samples starting on July 20, 1964 (II R. 10) from all but the Hallenbeck claim. None were taken from it because Mr. Roberts found no workings on that claim and because Mr. C. V. Hallenbeck, Sr., confirmed later that there were no further workings from which he could take additional samples. (Id. 33-38). The samples were later tested for gold content and the tests ranged from less than .01 milligrams to .25 milligrams of gold, which convert into dollar values of less than one cent to about three cents per cubic yard, calculated in terms of the price of gold when the samples were taken, $39 per troy ounce. Even converted according to the price of gold at the time of the hearing, $178.25 per ounce, the value of the richest claim would only be about 14 cents per cubic yard, and an average of the values of all the samples would be less than six cents per cubic yard. Based on his examination of the claims, Mr. Roberts concluded it would be an unprofitable venture to develop a mining operation on the claims. (Id. 41-42).
 
 
 19
 Plaintiffs presented evidence of testing which they had done on the claims. They testified that they took a total of seven samples from two of them. Tests on each of the seven samples, assuming a gold price of $39 per ounce, produced values of one cent to two cents per ton of material, and an eighth sample produced a value of 27 cents per ton.[5] At the $178 per ounce gold price, the values of gold in the seven samples ranged from two cents to ten cents per ton. The eighth sample's value of $1.25 per ton was viewed by the Board as anomalous, and without further samples, to indicate no consistent values. 21 IBLA 301-2.
 
 
 20
 The plaintiffs presented further test results which ran "nil" for platinum value and showed only small amounts of silver content. Plaintiffs did not know the weight of the sample concentrate they delivered to the assayer for testing. (II R. 116). C. V. Hallenbeck, Jr., stated that his father had said shortly before his death that if the price of gold ever reached $100 per ounce, they would "start up the placer." (Id. 167). He commented also that in his father's absence they would "go into more nearly a total type of testing program" and would "do further testing before setting up a large scale commercial operation." (Id. 165-67). After discussing the prospects for gold and sand and gravel on the claims in question, Clyde Hallenbeck testified that if the hearing resulted in a favorable ruling, he would venture capital to operate the claims. (Id. 206).
 
 
 21
 The Board agreed with the conclusions of the government witness, Mr. Roberts, and concluded that no prudent man would undertake development of a mining claim unless the showings were far superior to these. 21 IBLA 301. The Board also stated that plaintiffs indicated at the hearing that they believed the claims to be valuable for silver and platinum, but that their own samples show no platinum and a negligible amount of silver, citing Exhibit O. We must agree with the district court that the administrative record supports the findings of the Board.[6]
 
 
 22
 As to sand and gravel, Mr. Roberts testified that he did not test the claims for materials other than gold because this was what he was told that the claims were based on. (II R. 66, 89, 91-92).[7] Though Mr. Roberts did note that sand and gravel and other nonprecious materials were present on the claims, nothing in his testimony indicated that these materials were in any way unique or uncommon. See note 4, Supra.
 
 
 23
 The plaintiffs presented evidence that sand and gravel was sold to the Colorado State Highway Department and to Climax Molybdenum Company both before and after 1955. This material was from their father's Derry Ranch which was located about a mile north of the contested claims. (II R. 192-95, 203, 208). Mr. Clyde Hallenbeck estimated that gravel from the contested claims could be processed for between 60 cents and 70 cents per yard, and that gravel usable for surfacing roads or private driveways could be sold at $2 per yard. He said that economic conditions at the time of the hearing and in the foreseeable future were conducive to establishing an operation on the claims. (III R. 197, 201). He said also that sand and gravel as a by-product of a placer operation would be usable in the building trades and would make excellent plaster sand, and that the materials were very suitable for concrete aggregate. Plaintiffs conceded, however, that no sand or gravel had ever been sold from the contested claims, and they offered no evidence that they could have sold such materials from these claims in addition to that sold from the Derry Ranch property.
 
 
 24
 The Board noted this concession that no sand and gravel had ever been sold from the claims, and the absence of evidence that plaintiffs could have sold sand and gravel from the claims in addition to that sold from the other claims, and said that in short the plaintiffs failed to show there was a market for more sand and gravel than they were already producing. The Board said further that since the plaintiffs have not shown that a market exists for their material either before or after 1955, whether it is a common variety is irrelevant, that however the evidence does show that the material is a common variety of sand and gravel and consequently not locatable, and that no unique quality has been urged for this sand and gravel which would render it uncommon.[8]
 
 
 25
 We have considered Charlestone Stone Products Co., Inc. v. Andrus, 553 F.2d 1209 (9th Cir.), rev'd, 436 U.S. 604, 98 S.Ct. 2002, 56 L.Ed.2d 570 (as to ruling that water is a "valuable mineral" on which a claim may be located), which is relied on by the plaintiffs with respect to sand and gravel. In that case, however, there was substantial evidence of sales of sand and gravel from the various claims before and after 1955, and the plaintiffs also made a showing of profitability in the extraction of the materials. Here such proof is lacking.
 
 
 26
 We must agree again that the findings of the Board are supported by substantial evidence. We do not view the proof of sales from the other property as irrelevant,[9] but here we cannot say that the findings against the plaintiffs as to the sand and gravel from these claims are not supported by substantial evidence when viewed under the test as stated in United States v. Coleman, supra, 390 U.S. at 602-03, 88 S.Ct. 1327.[10]
 
 
 27
 Third, the plaintiffs contend that the government failed to carry its burden of establishing that the Hallenbeck placer claim was invalid. It is true that the government produced no specific evidence of tests showing the invalidity of this claim. However, the government's witness, Mr. Roberts, did testify that in examining it he found no workings on the Hallenbeck placer and that the late Mr. Hallenbeck had confirmed that there were no new workings on the claims. (II R. 35-36).
 
 
 28
 A Prima facie case for the government is made out when the mineral examiner testifies he has examined the exposed workings and found no mineralization sufficient to support the finding of a discovery; the examiner is not required to perform discovery work for the claimant, or to explore or sample beyond those areas which have been exposed by the claimant, as the examiner simply verifies whether a discovery has been made. United States v. Grigg, 79 I.D. 682, 687-88. The plaintiffs themselves presented no evidence of tests to establish the validity of the Hallenbeck claim. Since the ultimate burden of persuasion rested on the plaintiffs as claimants, we feel that the examiner's testimony that there were no workings, together with the absence of other evidence to the contrary, permits the inference that no discovery was made on the Hallenbeck claim. Thus, the findings as to that claim are also sufficiently supported.
 
 
 29
 Fourth, plaintiffs argue further that the district court erred as a matter of law when it held that a mineral claimant cannot "hoard" valuable minerals such as plaintiffs' sand and gravel for future sale. Plaintiffs say that it need not be shown that the mineral has been sold, but rather that it can presently be extracted, removed and marketed at a profit.
 
 
 30
 We would agree with the rule as stated but cannot say that the district court misapplied the law. We feel the court correctly followed the test of present marketability. See, E. g., Coleman, supra, 390 U.S. at 602-03, 88 S.Ct. 1327; Barrows v. Hickel, 447 F.2d 80, 83 (9th Cir.). The court's findings in the instant case stated that: "A private litigant cannot locate claims upon public lands and then simply wait until the minerals are in sufficient demand to be marketed at a profit," and also that: ". . . plaintiffs cannot hoard common sand and gravel on public lands until it becomes profitable to market such deposits." The court also quoted the following statement from the opinion in Foster v. Seaton, 106 U.S.App.D.C. 253, 255, 271 F.2d 836, 838:
 
 
 31
 To allow such land to be removed from the public domain because unforeseeable developments might some day make the deposit commercially feasible can hardly implement the congressional purpose in encouraging mineral development.
 
 
 32
 We feel that the district court did not err, and instead properly followed the marketability test. It is required that there be, at the time of discovery, a market for the discovered material that is sufficiently profitable to attract the efforts of a person of ordinary prudence. Barrows v. Hickel, 447 F.2d 80, 83 (9th Cir.). The question of marketability is one of fact. The absence of proof of actual sales of material from the claims is relevant but not conclusive and may be overcome by other evidence of marketability. Melluzzo v. Morton, 534 F.2d 860, 863 (9th Cir.). The evidence of lack of sales from the claims was relevant and we find no error in the ruling by the district court that the record supports the Board's findings.
 
 
 33
 Fifth, plaintiffs contend that the district court erred in not considering the valuable mineral deposits on adjoining property. They refer to the Derry Ranch property within one mile of the contested claims, and to sales of sand and gravel and recovery of gold therefrom.
 
 
 34
 We have dealt with a similar contention and the cases relied on earlier, as we discussed other arguments. See Note 9, Supra. It suffices to say again that the Board did not reject such evidence, that it was discussed in the Board's opinion, and that the Board's findings are supported by the record. The district court upheld the administrative law judge on the issue. We agree, and also conclude that the findings of the administrative law judge and the Board on this issue are supported by the record.The trial de novo issue.
 
 
 35
 Sixth, the plaintiffs argue that the district court erred in not granting them a trial De novo since the administrative law judge had been mistaken as a matter of law in holding that sand and gravel deposits will not serve to support a discovery required under the mining laws. Plaintiffs point to the statement of the administrative law judge that: ". . . the sand and gravel deposits will not serve to support a discovery required under the mining laws."
 
 
 36
 We must agree that the statement as made, and failure to consider that common sand and gravel deposits were locatable minerals before July 23, 1955, appear in error. Nevertheless, in view of the further consideration given to the issue by the Board, there was no prejudice to the plaintiffs. We agree with the view of the district court which rejected the contention with the following observation:
 
 
 37
 . . . (W)hile the administrative law judge may have misapplied the law by failing to consider that common sand and gravel deposits were locatable minerals before July 23, 1955, the plaintiffs were not prejudiced by such possible error because in reviewing the opinion of the administrative law judge and the transcript of the hearings, the IBLA applied the correct legal standard concerning the value of sand and gravel deposits as locatable minerals both before and after 1955.
 
 
 38
 The Board was authorized by 5 U.S.C. § 557(b) to exercise all the powers it would have in making the initial decision. It considered the issue properly, and reviewed the evidence and found that no market for sand and gravel was shown by plaintiffs to exist either before or after 1955. 21 IBLA 302. Thus, the final administrative ruling removed any prejudice to the plaintiffs and reached a conclusion which is supported by the record.
 
 
 39
 We have considered the remaining contentions of the plaintiffs and find that they are also without merit, and require no further discussion. Accordingly, we conclude that the district court properly upheld the administrative decisions, and the judgment is
 
 
 40
 AFFIRMED.
 
 
 
 [1]
 The names of the seven placer mining claims and their dates of location are as follows: Hidden and Harlan, 1915; Kangsen and Hallenbeck, 1939; Good Bet, Elk Park, and Connecting Link, 1953
 The lands containing the Good Bet, Elk Park and Hallenbeck Claims were segregated from further mineral entry on June 4, 1969 when an application for withdrawal of land was filed with the Bureau of Land Management. See 43 CFR § 2013.2-7 (1969) and 43 CFR §§ 2311.0-6 through 2311.2 (1969). Accordingly no further location or discovery could be made on these claims after that date. The withdrawal did not, however, preclude further samples from being taken from these claims to confirm any discovery before the date of withdrawal.
 
 
 [2]
 C. V. Hallenbeck, Sr. died approximately one month before the contest proceeding on these claims was commenced in December 1970. (III R. 245)
 
 
 [3]
 Although this was a ruling on review of the administrative record with no trial De novo, the findings and conclusions of the court were entered to indicate how the court arrived at its conclusions and the operative facts for which it found that there was substantial evidentiary support. See Nickol v. United States, 501 F.2d 1389, 1391 (10th Cir.)
 
 
 [4]
 The 1955 statute excepted materials having a property which gives them "distinct and special value," which could still be the basis for location of claims thereafter. See United States v. Guzman, 81 I.D. 685, 687; United States v. Henderson, 68 I.D. 26
 
 
 [5]
 See Contestees' Exhibits F and G
 
 
 [6]
 A discovery warranting further testing is not enough; the materials must be ascertained and of such extent as to render the land more valuable and to "justify their exploitation." Chrisman v. Miller, 197 U.S. 313, 321, 25 S.Ct. 468, 49 L.Ed. 770
 
 
 [7]
 Thus it might be argued that no Prima facie case was made as to invalidity of the claim with respect to sand and gravel, and that further examination or hearings on sand and gravel or other materials should occur. The Contestees' did, however, present testimony and argument on sand and gravel and other minerals in addition to gold at the administrative hearing, and thus were apparently attempting to defend the claims on all minerals. Since the contest was thus tried and decided, we do not feel that the plaintiffs were denied a fair hearing on the other minerals, or on gold, and do not feel that a reopening of the hearing or further proceedings are required
 
 
 [8]
 By this comment the Board was apparently ruling out the possibility of a location since 1955 on the basis of materials having a distinct and special value
 
 
 [9]
 The plaintiffs rely on Cascaden v. Bortolis, 162 F. 267, 271-72 (9th Cir.), and Lange v. Robinson, 148 F. 799 (9th Cir.). In a controversy between private parties, in Cascaden the court held that where there was evidence of actual existence of gold on the claim in question, it was error to refuse to permit the plaintiffs to show the situation, character, value and mineralogical conditions of adjacent claims, which conditions were nevertheless "evidentiary." 162 F. at 271
 In the Lange case there was proof of some washings with "fine colors of gold" on the claim involved and of discovery of gold on another tract within one mile and it was held that a valid location of a placer claim was established. However, as the opinion notes, with respect to mineral lands in a controversy between private claimants, the question is simply which is entitled to priority. 148 F. at 803. Under the marketability standard which we must apply to these claims to public lands against the government, we do not feel that these cases are controlling. See Converse v. Udall, 399 F.2d 616, 619-20 (9th Cir.).
 The decision of the Board did not reject the testimony on sales from the other property as wholly irrelevant. It noted instead that "sand and gravel came from other claims, and appellants have offered no evidence that they could have sold sand and gravel from these claims in addition to the sand and gravel from the other claims. In short, they have failed to show that there was a market (or demand) for more sand and gravel than they were already producing." (21 IBLA at 302).
 
 
 [10]
 We are satisfied that the record supports the general finding that the appellants had not shown a market for more sand and gravel than they were already producing and that the evidence shows that the material is a common variety of sand and gravel. While there is a statement by plaintiffs that their testimony showed "unusual plaster and concrete aggregate" in addition to common sand and gravel (Brief of Plaintiffs-Appellants, 10), the testimony in the record supports the finding of the Board. Clyde Hallenbeck said that the sand and gravel from the Good Bet claims would make excellent plaster sand. However, in response to a question whether the gravel had any special properties or characteristics, he said that:
 In this particular area it is all sand. There would be no that would be the one thing that would make it very productive is that you wouldn't have to separate it. (III R. 202-03).
 We feel that the finding that the sand and gravel were a common variety is supported by the record.