Stephen W. GROPP, Petitioner,

v.

**DISTRICT OF COLUMBIA BOARD OF DENTISTRY, Respondent.**

No. 90–1519.

District of Columbia Court of Appeals.

Argued Dec. 2, 1991.
Decided April 3, 1992.
As Amended May 7, 1992.

Jeffrey M. Johnson, Washington, D.C., for petitioner.

Susan S. McDonald, Asst. Corp. Counsel, with whom John Payton, Corp. Counsel, Charles L. Reischel, Deputy Corp. Counsel, Lutz Alexander Prager, Asst. Deputy Corp. Counsel, were on the brief, for respondent.

Before FARRELL and KING, Associate Judges, and PRYOR, Senior Judge.

KING, Associate Judge:

Petitioner, Dr. Stephen Gropp, challenges the findings of the District of Columbia Board of Dentistry (hereinafter the Board) for revoking his license to practice in the District of Columbia and barring him from applying for reinstatement for two years. The Board instituted action against petitioner pursuant to D.C.Code § 2-3305.-14(a)(13) (1988 Repl.) by filing one charge of submitting false statements to collect fees for services which were not provided. Two specifications stem from that charge. Specification A refers to insurance claims submitted in 1985 to the Pilot Life Insurance Company ("Pilot") for dental services for Ms. Rosa Torres–Alverez in November 1984 and September 1985. Specification B relates to insurance claims submitted in 1983 to Aetna Life Insurance Company ("Aetna") for dental services for Ms. Kathleen M. Lyons in October and November 1981, and in April and May 1982.

In this appeal, petitioner claims the Board erred by (1) making findings not supported by substantial evidence as to specification A; (2) basing its findings solely on documentary evidence and an affidavit as to specification B thereby denying Dr. Gropp the opportunity to confront and cross examine adverse witnesses; (3) imposing a penalty that was excessively harsh and not supported by substantial evidence; (4) unduly delaying the institution of the proceedings; and (5) failing to consider a reasonable settlement proposed in good faith by Dr. Gropp. We affirm.

## I.

Ms. Rosa Torres–Alverez ("Torres–Alverez") first became a patient of Dr. Gropp in October 1985. On October 8, October 18, and October 24, 1985, and November 1 and November 8, 1985, Dr. Gropp provided dental services for her which included X–rays, fitting and adjusting of a bridge, and cleaning of the teeth. (Gov.Ex. # 1). In an undated submission in 1985 ("Pilot # 1"), Dr. Gropp requested payment from Pilot for services the doctor claimed were provided to Torres–Alverez on November 14, and November 21, 1984, approximately one year before the dates set forth above. In that claim, he asserted the services provided included an oral examination/bite wing x-ray (2)/periapical x-ray (8)/complete occlusal adjustment/diagnostic casts and bridge work on teeth numbered 6, 7, 8, and 9. (Gov.Ex. 11, Attachment J). In a second undated submission to Pilot[1] in 1985, Dr. Gropp also submitted a claim ("Pilot # 2") for performance of four quadrants of subgingival curettage and for providing an occlusal appliance for bruxism (night guard) for services claimed to have been performed by him on September 12 and 15, 1985. In that claim, Dr. Gropp also indicated that on September 8, 1985, he performed the following: oral exam/bite wing x-ray (2)/periapical x-rays (8)/prophylaxis/complete occlusal adjustment/diagnostic casts. (Gov.Ex. 11, Attachment K).

On October 15, 1985, Dr. Gropp submitted a claim to Aetna[2] for services he reported he performed on Torres–Alverez on October 7 and October 11, 1985. The services listed on that claim were: oral exam/bite wing X–ray (2)/periapical x-rays (8)/prophylaxis/complete occlusal adjustment/complete periodontic scaling on October 7, 1985. The claim also listed diagnostic casts and bridge work to the teeth numbered 6, 7, 8, and 9 provided on October 11, 1985. (Gov.Ex. 11, Attachment O). Dr. Gropp testified that this claim to Aetna was pending when he submitted Pilot # 1.

On November 19, 1985, Pilot sent Dr. Gropp payment in the amount of $1000 for services he claimed to have performed on Torres–Alverez on November 14 and 21, 1984 in Pilot # 1. On October 1, 1985, Torres–Alverez's insurance coverage changed from Pilot to Aetna Insurance Company. In January 1986, Pilot requested a refund of the $1000 payment made in

---

1. In a supplemental pleading, the government makes a concession that this claim was submitted to Aetna rather than Pilot. As discussed later, it does not appear to the court that such a concession is well founded. See note 7, infra.

2. Dr. Gropp was not formally charged with any wrongdoing with respect to this claim.

November 1985 for Pilot # 1. Dr. Gropp made the refund in March 1986.

With respect to specification B, Dr. Gropp submitted claim forms on behalf of Kathleen Lyons ("Lyons") to Aetna Insurance Company in early 1983 for services said to have been provided in October and November of 1981 and in April and May 1982. The doctor claimed he treated Lyons for orthodontic, endodontic, crowns, and related services. (Gov.Ex. 11, Attachments C, E, and F). In an affidavit, Lyons swore that she had not been provided any of the dental services listed in the claims. (Gov. Ex. 12). Aetna made a payment of $1122.90 to respondent for these services in January 1984.

On October 20, 1989, the Board served petitioner with notice of intent to take disciplinary action against him for filing false statements to collect fees for services which were not provided to patients.[3] On January 18, 1990, the Board notified Dr. Gropp of a hearing date scheduled for March 14, 1990. On March 5, 1990, Dr. Gropp filed a motion to dismiss. The date for the hearing was continued; however, it was eventually conducted on July 18, 1990.

At the hearing, Torres–Alverez testified that some of the services the doctor claimed he rendered were in fact provided; however, the services were actually performed nearly one year after the dates set forth in the claim submitted in Pilot # 1. Torres–Alverez denied ever receiving a night guard in September 1985 or at any time from Dr. Gropp. In addition, Torres–Alverez was questioned by the Board members regarding the claimed treatment for four quadrants of subgingival curettage. Based on her testimony, the Board concluded that "each quadrant of subgingival curettage requires a local anesthesia, at least one hour per quadrant and is normally done in four separate appointments." The claim submitted, however, was for performance of this service on a single day, i.e., September 12, 1985. Furthermore, since no anesthesia was administered to the patient and no after effects were ever felt by her after treatment by Dr. Gropp, the

Board concluded it was "highly unlikely that petitioner performed the subgingival curettage procedure . . . since the discomfort associated with it is not likely forgotten."

Also, at the hearing, the government introduced an affidavit executed by Lyons in which she denied receiving the services set forth in the claim form submitted to Aetna in 1983. She also swore that she did not sign her name to the forms and that she had not authorized petitioner to sign her name for her. Dr. Gropp admitted that he did not provide the dental services to Lyons described in the claim and that he had no records to show when he provided any services to her. He also admitted that he signed Lyons's name on the form without her permission.

## II.

■ Petitioner claims that the finding of facts and conclusions of law made by the Board with respect to specification A were not supported by substantial evidence. Specification A charges that Dr. Gropp submitted claims for services allegedly rendered to Torres–Alverez in November 1984 and September 1985 knowing that such services were not provided on those dates. The main focus of the Board was upon the claim for services alleged to have been performed in November 1984. Dr. Gropp maintains that the services claimed actually were performed in October and November 1985 (rather than November 1984), and he argues that he made the simple mistake of listing the wrong dates. The Board rejected that explanation, and there is substantial evidence to support its determination to do so.

In his brief to this court, Dr. Gropp characterizes Pilot # 1 as the "November claim form" arguing that it was submitted in November 1985. As noted above, the claim form itself was undated, and there is no evidence in the record when it was submitted by Dr. Gropp or received by Pilot. The claim was processed by Pilot on November 19, 1985, and two checks totaling

3. D.C.Code § 2–3305.14(a)(13) (1988 Repl.).

$1000 were sent to petitioner on that date. Dr. Gropp admitted that he did not perform any services for Torres–Alverez in 1984. He testified, however, that he did perform services for her in 1985 and that the submission listing the 1984 date was simply an error on his part.

Dr. Gropp contends that he actually performed the services set forth in Pilot's # 1 in 1985 rather than 1984. Therefore, no fraud was committed by him. The Board did not credit his explanation noting that, while it could understand Dr. Gropp listing the wrong year on a claim, it could not accept his explanation since every date he recorded was incorrect,[4] and the services listed as performed by him were not the same services the patient received.

We also note that Dr. Gropp claimed he provided the patient oral exam/bite wing X–rays (2)/periapical X–rays (8)/prophylaxis/complete occlusal adjustment/diagnostic casts on September 8, 1985 in Pilot # 2. He billed Aetna for the identical services plus "complete occlusal adjustment" which he claimed were performed on October 7, and 11, 1985. Finally, if we accept Dr. Gropp's contention that he simply recorded the wrong year on Pilot # 1, then he sought reimbursement for performance of the identical services again (less the prophylaxis) in October or November 1985.

Thus, Dr. Gropp submitted claims for essentially the same services in three separate claims over a two month period to two different insurance companies. Further, he testified unequivocally that he submitted Pilot # 1 after he had submitted the Aetna claim for the same services.[5] He offered no explanation for having done so. We can readily see, therefore, how and why the Board chose not to believe Dr. Gropp.

Finally, we turn to Pilot # 2, which the parties refer to as the September claim. That claim listed the services set out in the previous paragraph as having been performed on September 8, 1985. Dr. Gropp also claimed to have performed four quadrants of subgingival curettage and to have provided a night guard on September 12 and 15, 1985. The Board concluded, for the more than ample reasons noted previously, that neither of the latter services were provided by Dr. Gropp.[6]

Petitioner maintains, however, there is insufficient evidence to establish that he submitted this claim to Pilot in an effort to seek payment. We agree that the record is sparse concerning whether this form was actually submitted to Pilot or whether it was considered by Pilot as a claim for services performed.[7] There is nothing in

4. The patient testified she received treatment on October 8, 18, 24, and November 1 and 8, 1985. Personnel records showed that she took sick leave from her place of employment from 1 to 2½ hours each of the those days, and that she took no other sick leave from September 8, 1985, to the end of that year. She also took no sick leave in November 1984. The dates Dr. Gropp claimed he provided services were September 8, 12, and 15, 1985 (Pilot # 2) and November 14 and 21, 1984 (1985?) (Pilot # 1).

5. The Board found that the Aetna. claim was filed after Pilot # 1 was filed, rather than in the reverse order as Dr. Gropp testified. We can find no basis in the record for the Board's finding. We conclude that, even if the Board's finding were erroneous, it does not affect the results since we believe that Dr. Gropp's culpability is greater if Pilot # 1 was submitted after the Aetna claim was filed.

6. When she was shown Pilot # 2 at the hearing, the patient testified that she had received the services listed but on dates different from those indicated. The first six entries in that claim are

for the services discussed above which were also claimed on the other two claim forms. The remaining five entries were for the four quadrants of subgingival curettage and the night guard. At the conclusion of her testimony, one of the Board members inquired whether she received a night guard, anesthesia, or whether she had ever felt any discomfort after receiving treatment. To each question, she answered no, and as a result the Board concluded that she received neither the night guard nor the subgingival curettage for the reasons set forth in the text, *supra* at 4–5. Contrary to petitioner's arguments, the Board was not required to reject these answers because of the patient's earlier generalized testimony that she had received the treatment listed in the claim form.

7. A copy of Pilot # 2 first appears in the record as an appendix to Government Exhibit No. 9 which is a letter written to counsel by a representative of Pilot together with a sworn affidavit from the custodian of records attesting that it, and the other documents provided, were true and complete copies of records maintained by Pilot. It also can be found as Appendix K to

the record indicating that it was ever processed by Pilot or that any payments were ever made to Dr. Gropp on that claim. We need not decide, however, whether it in fact was submitted to Pilot in an effort to receive payment since it was not the real basis for the Board's finding as to specification A. Rather the Board essentially concluded that Pilot # 1 was the fraudulent claim, and it is that claim that principally constituted the violation set forth in Specification No. 1.[8] The claim in Pilot # 2 was used primarily by the Board as circumstantial evidence of Dr. Gropp's lack of candor when he sought to justify the discrepancies in the Pilot # 1 by claiming he had made a simple mistake.

We are satisfied, therefore, that there was substantial evidence for the Board's conclusion that Dr. Gropp "submitted a false statement to Pilot Insurance Company for payment for services [he] did not provide to [Torres–Alverez]." That false statement was Pilot # 1 for services claimed to have been provided in November 1984—services that were not in fact performed.

Government Exhibit 11, which was submitted by Aetna.

In its supplemental pleading, the government concedes that this claim form was submitted to Aetna rather than to Pilot. The concession is undercut by the fact that Aetna did not become Torres–Alverez's insurer until October 1, 1985. We also note that Appendix J to Government Exhibit 11 is a copy of Pilot # 1, which no one disputes was submitted to Pilot. Also, Appendix G to that exhibit is a letter from the patient's employer transmitting documents in its file to Aetna. It seems likely that at some point either Pilot or the employer provided Aetna with copies of all claims it had received on behalf of the patient and that Aetna submitted the forms it received along with its own documents in response to the subpoena. Thus, it would appear that the claim was not submitted to Aetna, as the government states in its supplemental pleading, but was in fact submitted to Pilot.

8. The Board made the following conclusion of law with respect to specification A:

Respondent also submitted a false statement to Pilot Insurance Company for payment for services Respondent did not provide to [Torres–Alverez] (see findings numbered 4, 5, 6, 7, 8 and 9) in violation of section 514(a)(13) of the act, D.C.Code § 2–3305.14(a)(13) (1988). Respondent contends that his refund

### III.

■ Here, petitioner contends that the Board's order should be vacated to the extent it is based on the affidavit of Kathleen Lyons and certain unsworn documents. As to the affidavit, petitioner maintains that it is inadmissible hearsay and that he was denied the opportunity to test Lyons's credibility by cross examination. It is settled that hearsay evidence may be admitted in administrative hearings.[9] *Richardson v. Perales,* 402 U.S. 389, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971); *Jadallah v. District of Columbia Department of Employment,* 476 A.2d 671, 676 (D.C.1984); *Simmons v. Police & Firefighters' Retirement & Relief Bd.,* 478 A.2d 1093, 1094 (D.C.1984); *General Ry. Signal Co. v. District Unemployment Compensation Bd.,* 354 A.2d 529, 531 (D.C. 1976); *Wallace v. District Unemployment Compensation Bd.,* 294 A.2d 177, 179 (D.C. 1972). Administrative tribunals are not required to disregard evidence merely because it is hearsay. *See Wisconsin Ave. Nursing Home v. District of Columbia Human Rights Comm'n,* 527 A.2d 282, 288 (D.C.1987).[10]

of the $1,000 to Pilot should result in dismissal of this charge. However, the Respondent is not charged with failing to refund monies he improperly received, but with submitting claims for services not provided as claimed. Even if he had not received the payment, the wrongful act was completed when he submitted the false claims for the purpose of collecting a fee.

9. D.C.Code § 1–1509(b) (1987 Repl.) provides that "[a]ny oral and any documentary evidence may be received, but ... every agency shall exclude irrelevant, immaterial, and unduly repetitious evidence."

10. "[H]earsay evidence can serve under some circumstances as 'substantial evidence' on which to base a finding of fact." *Wisconsin Avenue Nursing Home, supra,* 527 A.2d at 288. Its weight is determined by "the item's 'truthfulness, reasonableness, and credibility.'" *Id.* at 288 (quoting *Johnson v. United States,* 202 U.S.App.D.C. 187, 190–191, 628 F.2d 187, 190–191 (1980)). Factors to consider in evaluating the reliability of hearsay evidence include:

whether the declarant is biased, whether the testimony is corroborated, whether the hearsay statement is contradicted by direct testimony, whether the declarant is available to

Assuming *arguendo*, however, that Lyons's affidavit and the accompanying attachments should not have been admitted, there is other evidence that the claimed services were never performed. First, Dr. Gropp admitted signing Lyons's name without having been given permission to do so. Moreover, the Board found that petitioner admitted, at the hearing, that he did not perform the services listed on the claim.[11] In any event, he could provide no evidence that the services were in fact provided. Based on these factors alone, we conclude there was substantial evidence to support the Board's finding of fraud. D.C.Code §§ 2–3305.14(a)(3), (c)(3) (1988 Repl.).

### IV.

■ Next, petitioner claims that the sanctions imposed by the Board were not supported by substantial evidence, and therefore the Board's action amounts to an abuse of discretion. Specifically, he contends that the Board's two year revocation of his license to practice dentistry is "so unconscionably disproportionate that [t]he punishment does not fit the crime." *See, e.g., Swentek v. United States*, 658 F.2d 791, 796, 228 Ct.Cl. 468 (1981); *Power v. United States*, 531 F.2d 505, 509–10, 209 Ct.Cl. 126 (1976).

We are not persuaded. In the cases relied on by petitioner, the evidence submitted before the administrative tribunal did not support a finding that the respective respondents committed the violations alleged. Here, as we have held, there was ample evidence that petitioner committed fraud. In fact, he admitted, with respect to one of the specifications, that he forged the patient's signature. Therefore, we are satisfied that there was a sufficient basis for the Board to revoke his license. D.C.Code §§ 2–3305.14(a)(13), (c)(3) (1988 Repl.).[12]

### V.

Petitioner also claims the order should be vacated because of the Board's "undue and unjustified delays."[13] *JBG Properties Inc. v. District of Columbia Office of Human Rights*, 364 A.2d 1183 (D.C.1976). Specifically, Dr. Gropp complains that three years elapsed from the time the Board completed its investigation in 1986 until the time formal charges were filed in 1989. He claims that the delay prejudiced him because, during the investigatory period, files containing Lyons' records were destroyed in floods.

Dr. Gropp's claim on this point amounts to an assertion of defenses based on estoppel and laches. As to the claim of estoppel, "[t]raditionally, courts in the United States refused to recognize equitable estoppel claims against the government or any of its agencies under the doctrine of sovereign immunity." *United States v. Arkwright, Inc.*, 690 F.Supp. 1133, 1142 (D.N.H.1988) (citing *Portmann v. United States*, 674

---

testify and be cross-examined, and whether the hearsay statements were signed or sworn. *Id.* at 288 (citation omitted).

11. Dr. Gropp disputes this characterization of his testimony before the Board. The transcript reveals the following:

Q Is it your testimony that you did not render those dental services or provide those dental services to Mrs. Kathleen Lyons?
A (Dr. Gropp) I guess not.
(Tr. 122–23).

12. D.C.Code § 2–3305.14(a)(13) provides:
(a) Each board ... may take 1 or more of the disciplinary actions ... against any ...: person permitted ... to practice the health occupation regulated by the board ... who....
(13) Submits false statements to collect fees for which services were not provided;

Subsection (c)(3) provides:
(c) Upon determination by the board that a ... person permitted ... to practice ... has committed any of the acts described in subsection (a) of this section, the board may:
(3) Revoke or suspend the privilege to practice in the District of any person permitted to ... practice in the District.

13. We also reject petitioner's position that the Board's order should be vacated because he was not notified of the hearing date within the 20 days following the receipt of his request for a hearing as required by 17 DCMR § 4104.1 (1990). This court has held that language such as that in § 4104.1 providing administrative timetables is directory, not mandatory. *See, e.g., Mannan v. District of Columbia Bd. of Medicine*, 558 A.2d 329, 334 (D.C.1989); *Vann v. District of Columbia Bd. of Funeral Directors & Embalmers*, 441 A.2d 246, 247–248 (D.C.1982).

F.2d 1155, 1158–59 (7th Cir.1982)). Furthermore, the Supreme Court has not resolved the issue of whether estoppel may ever be applied against the government. *Heckler v. Community Health Services,* 467 U.S. 51, 60, 104 S.Ct. 2218, 2224, 81 L.Ed.2d 42 (1984); *see Office of Personnel Management v. Richmond,* 496 U.S. 414, 423, 110 S.Ct. 2465, 2471, 110 L.Ed.2d 387 (1990). However, in recent opinions, the Supreme Court has suggested that estoppel may be applied against the government where "the traditional elements of estoppel are present." *Heckler, supra,* at 61, 104 S.Ct. at 2224 and where there is a showing of some type of "affirmative misconduct" by a government agent. *Schweiker v. Hansen,* 450 U.S. 785, 788–90, 101 S.Ct. 1468, 1470–72, 67 L.Ed.2d 685 (1981); *Immigration & Naturalization Serv. v. Hibi,* 414 U.S. 5, 8, 94 S.Ct. 19, 21, 38 L.Ed.2d 7 (1973); *Montana v. Kennedy,* 366 U.S. 308, 314, 81 S.Ct. 1336, 1340, 6 L.Ed.2d 313 (1961). In that connection, the Court has indicated that mere delay does not constitute "affirmative misconduct." *Immigration & Naturalization Serv. v. Miranda,* 459 U.S. 14, 18, 103 S.Ct. 281, 283, 74 L.Ed.2d 12 (1982) (no estoppel where I.N.S. took 18 months to process respondent's application); *Jaa v. Immigration & Naturalization Serv.,* 779 F.2d 569 (9th Cir.1986) (I.N.S. not estopped from denying permanent residence because of 58 month delay in processing alien's application). *Chien–Shih Wang v. Attorney General of the United States,* 823 F.2d 1273 (8th Cir.1987) (I.N.S. not estopped from denying permanent residence because of 36 month delay in processing alien's application).

■ A laches defense requires a "showing of lack of diligence on the [government's] part and of prejudice to the [petitioner]." *Hallenbeck v. Kleppe,* 590 F.2d 852, 855 (10th Cir.1979) (citing *Roberts v. Morton,* 549 F.2d 158, 163–64 (10th Cir. 1976), *cert. denied,* 434 U.S. 834, 98 S.Ct. 121, 54 L.Ed.2d 95 (1977)). However, laches is not applicable to a government agency acting to protect a public interest. *Chromcraft Corp. v. United States Equal Employment Opportunity Comm'n,* 465 F.2d 745, 746 (5th Cir.1972). Simply because

these equitable doctrines do not apply, however, does not mean that agencies are free to unjustifiably delay the prosecution of cases. *See* Administrative Procedure Act, 5 U.S.C. §§ 555(b), 706(1) (1988). In instances of delay, courts "require a showing of prejudice before agency action can be set aside for its lack of punctuality." *Chromcraft Corp., supra,* 465 A.2d at 747; *see, e.g., In re Williams,* 513 A.2d 793, 797 (D.C.1986). *JBG Properties Inc. v. District of Columbia Office of Human Rights, supra.*

■ We, of course, do not condone delay of the nature present here, especially since no explanation has ever been provided by the government. Nevertheless, we are satisfied that Dr. Gropp should not be relieved of the sanctions imposed against him because of that delay. First, we find no indication of any intentional delay by the Board. *See Hallenbeck v. Kleppe, supra,* 590 F.2d at 855. Second, we are not persuaded by petitioner's claim of prejudice because records were destroyed due to flooding during the course of the investigation. He testified that his storage area was flooded several times between 1982–1986. Since proceedings were initiated against petitioner in 1989, it is not clear that the records would have been available even if the proceedings had begun in 1986 when the investigation was completed. By that time, the records had already been lost, and no prejudice to petitioner occurred on account of the delay from 1986 to 1989. Further, petitioner was allowed to continue his dental practice, without interruptions, during the investigation, scheduling, and processing of his case. *See Salama v. District of Columbia Bd. of Medicine,* 578 A.2d 693, 695, n. 1 (D.C.1990).

■ In administrative proceedings, respondents are not guaranteed the same constitutional right to a speedy trial that applies in criminal cases. *See In re Williams, supra,* 513 A.2d at 796. A license to practice medicine is not an absolute right. *See Roberts v. Board of Medicine,* 577 A.2d 319, 325 (1990). A health professional maintains a position of trust

toward not only his patients but to the community. Disciplinary proceedings are held to determine whether a health professional is fit to continue practicing his profession. A betrayal of that trust which the practitioner is required to maintain "demands appropriate discipline; a delay in prosecution, without more, cannot override this necessity." *Id.* at 796.

### VI.

Finally, petitioner contends the Board erred by not "considering on the merits" his pre-hearing offer of settlement.[14] Specifically, he maintains the Board was obligated to make findings of fact and conclusions of law with respect to the factors set forth in *Proctor v. District of Columbia Rental Housing Comm'n*, 484 A.2d 542, 548 (D.C.1984) which he claims must be considered by the Board in evaluating his settlement proposal.

Petitioner's reliance on *Proctor* is misplaced. There the landlord, on one side, and all the tenants of the landlord's building, except one, on the other, had agreed to a proposed settlement of a dispute before the Rental Housing Commission (RHC) relating to across-the-board rent increases in the building. Because not all of the tenants agreed, the settlement agreement was not adopted. The RHC eventually ordered rent increases less favorable to the tenants than what had been set forth in the settlement. This court held that the RHC must give careful consideration to the settlement before rejecting it as the basis for its decision.

The circumstances in *Proctor* are very different from those in this case. Unlike *Proctor*, this case involves quasi-criminal activities with the District of Columbia acting as a quasi-prosecutor in a proceeding involving a health care provider accused of fraud. *Proctor* dealt with the issue of whether parties on the same side must agree unanimously to a settlement, agreed to by most members of that party as well

as the opposing party, before an agency may use it as a basis for its decision. The case at bar, however, deals with a bare settlement offer made by petitioner. No agreement or near agreement had been reached between Dr. Gropp and the District; therefore, there was nothing for the Board to consider. Accordingly, there was no error on the Board's part. *See id.* at 548.

### VII.

We conclude that the District of Columbia Board of Dentistry did not err in its finding that petitioner submitted false claims with intent to defraud. According, we affirm the Board's order revoking petitioner's license to practice dentistry and the conditions thereof.

*So ordered.*

---

**14.** In a letter dated June 6, 1990, petitioner offered to settle this matter by reimbursing Aetna Life and Casualty Insurance Company for claims submitted on behalf of Lyons in the

amount of $1,222; paying a civil penalty to the Board in the amount of $2,500; and performing 100 hours of *pro bono publico* dental work at a clinic in Washington over a span of 2 years.