John W. COMPTON, Petitioner,

v.

**DISTRICT OF COLUMBIA BOARD OF PSYCHOLOGY,**
Respondent.

No. 02–AA–1416.

District of Columbia Court of Appeals.

Argued Feb. 4, 2004.
Decided Sept. 23, 2004.
As Amended Dec. 2, 2004.

John W. Karr, Washington, DC, for petitioner.

William J. Earl, Assistant Attorney General, with whom Robert J. Spagnoletti, Attorney General, and Edward E. Schwab, Deputy Attorney General, were on the brief, for respondent.*

Before RUIZ and WASHINGTON, Associate Judges, and BELSON, Senior Judge.

RUIZ, Associate Judge:

John W. Compton petitions this court for review of an order issued by the District of Columbia Board of Psychology ("Board") revoking his license to practice psychology for engaging in sexual harassment of a patient and failing thereby to conform to the standards of acceptable conduct and prevailing practice within his profession. He asks us to decide whether evidence almost exclusively hearsay in nature constituted the critical mass of "substantial evidence" required under principles of administrative law to sustain the Board's decision. After a measured examination of the record commensurate with our limited standard of review, we hold that the particular hearsay evidence at issue in this case, which formed the core of the accusation, was too insubstantial to support the revocation order. We accordingly reverse and remand the case for further proceedings.

## I.

### A. *Factual History*

Dr. Compton has been a practicing psychologist since 1969. In 1981, he commenced a joint practice with Dr. Doree Waldbaum Lynn providing individuals and couples group therapy. They also developed a successful mentoring program for young mental health professionals establishing their careers. The joint therapy practice and professional mentoring program continued for fourteen years until the autumn of 1995 when Drs. Compton and Lynn dissolved their professional relationship.

During its lifetime, the partnership grew into "one of the largest ... in Washington, D.C.," propelling both doctors into successfully cross-marketed individual and joint practices. The instant case is an apt example. In 1986, Dr. Compton began treating F.M.K., a licensed professional counselor herself. Apparently pleased with the individual mental health services she received, F.M.K. commenced couples group therapy with her husband, which was co-led by Drs. Compton and Lynn. F.M.K.'s husband thereafter began a separate course of individual treatment with Dr. Lynn. Beginning in 1991, F.M.K. was additionally mentored by Dr. Compton, and to a lesser extent by Dr. Lynn, in the management of her own professional practice. While F.M.K.'s individual therapy with Dr. Compton concluded in 1993, both the couples group therapy and professional mentoring continued until 1995 when the joint practice dissolved.

In October 1995, two years after her individual therapy with Dr. Compton had ended but while her couples therapy and practice mentoring were still on-going, F.M.K. revealed to Dr. Lynn apparently during a therapy session that she "had some sort of sexual connection" with Dr.

* At the time the briefs were filed, Messrs Earl, Spagnoletti, and Schwab were called Assistant Corporation Counsel, Corporation Counsel, and Deputy Corporation Counsel, respectively. Since that time, however, the Mayor of the District of Columbia has issued an executive order re-designating the Office of Corporation Counsel as the Office of the Attorney General for the District of Columbia. *See* Mayoral Order No. 2004–92, 51 D.C. Reg. 6052 (May 26, 2004) (citing D.C.Code § 1–204.22(2) & (11) (2001)). We therefore employ the titles applicable at the time of this opinion's publication.

Compton, vaguely implying that he had engaged in sexual intercourse with her. Although the revelation was "muddled" and "confused," it prompted Dr. Lynn to write a letter to F.M.K. on December 18, 1995, shortly after the joint practice had dissolved, expressing concern about the allegations, urging F.M.K. to seek therapy on the matter, and suggesting that F.M.K. release Dr. Lynn from her duty of confidentiality so that Dr. Lynn could report the matter to the appropriate authorities. F.M.K. did not respond to the letter, and Dr. Lynn did not make a report to the licensing authorities.

Several months later, in February 1996, F.M.K. and her husband commenced a new treatment regime in the form of marital counseling with Dr. John Zinner. During these counseling sessions, they identified Dr. Compton's alleged sexual misconduct as the root cause of their marital discord. Thereafter, in August 1996, F.M.K. commenced individual psychotherapy with Dr. Susan Lazar and again revealed Dr. Compton's alleged sexual misconduct.

## B. Procedural History

F.M.K. filed a lawsuit in 1997 in the Superior Court of the District of Columbia, alleging that Dr. Compton's sexual misconduct constituted medical malpractice and that Dr. Lynn had negligently failed to protect F.M.K. from the abuse. Both F.M.K. and Dr. Compton were deposed during discovery. The case ultimately settled before trial.

Thereafter, Drs. Zinner and Lazar filed on their own initiative a joint complaint with the Board regarding Dr. Compton's alleged misconduct. The Board acted on the complaint by issuing a notice of intent to bring disciplinary proceedings against Dr. Compton, charging him with engaging in sexual harassment of a patient [1] in violation of the standards of acceptable conduct and prevailing practice within the psychology profession.[2] Dr. Compton filed a timely request for a hearing, and the matter was assigned to a D.C. Department of Health administrative law judge ("ALJ").[3]

During a preliminary hearing on March 19, 2002, the government moved to admit into evidence portions of F.M.K.'s deposition testimony from the 1997 civil suit. The government explained that it intended to call F.M.K. to the witness stand only in rebuttal, if at all.[4] Dr. Compton objected to substituting F.M.K.'s deposition for her live testimony, arguing that her designation by the government as a rebuttal witness established her availability, thus obviating the government's need to rely on the deposition in its case-in-chief. The ALJ overruled the objection, reasoning that

> the fact that the person is not here, not testifying live, not in a position where I can observe her, and is not tested by cross-examination or not available to answer questions that I might have in reading her testimony all goes to the weight that I will give that [deposition.] But I have no basis to—I've had other

1. See D.C.Code § 2-3305.14(a)(23) (1994).

2. See D.C.Code § 2-3305.14(a)(26) (Supp. 1999).

3. The Board also initiated disciplinary proceedings against Dr. Lynn, charging her with failure to conform to the standards of acceptable conduct and prevailing practice within the profession by failing to protect F.M.K. from Dr. Compton's alleged misconduct. Al-though initially consolidated with the present case, the charges against Dr. Lynn were settled shortly before commencement of formal hearings.

4. The government explains on appeal that it made this strategic decision in an effort to minimize F.M.K.'s exposure to the emotional trauma potentially arising from having to testify in person.

circumstances ... where the complaining witness's testimony has come in as hearsay and is evaluated as such.

So I don't see a reason that I can exclude it. Whether or not that winds up hurting [the government] or helping you [Dr. Compton], we'll see what happens.

The ALJ indicated that he was willing to entertain Dr. Compton's future motions to admit whatever additional portions of the deposition were necessary for impeachment purposes.

Evidentiary hearings commenced on April 2, 2002. To prove its allegations, the government relied almost exclusively on F.M.K.'s deposition testimony. As the ALJ would later summarize in his report, in her deposition,

> F.M.K. testified that Dr. Compton began making sexual overtures to her shortly after she began individual therapy with him in 1986, and that he engaged in sexual intercourse with her in his office on one occasion in June or July 1991. She asserted that there were numerous other instances when he "acted sexual" toward her and "put a lot of pressure on me to be sexual with him." As [two] examples of that conduct, she testified that he "convinced me to get undressed in his office" during therapy sessions, "licked ... and kissed my neck," "grabbed [me] ... and kissed me on my lips," "sat next to me on the couch and asked me to put my head on his shoulder across his chest," and "sucked on my breast." According to [F.M.K.], Dr. Compton also would tell her "you have the body of a whore," and "I want to fuck you," and, after the fall of 1991 also would ask her "when are we going to fuck again?" According to [F.M.K.], Dr. Compton's sexual advances and conversations occurred in about [twenty-five percent] of her sessions with him between 1987 and 1995, except for a period of about [one and one-half] years during 1988 and 1989 when she was pregnant and nursing her son.

Drs. Zinner and Lazar also testified during the government's case-in-chief to corroborate F.M.K.'s deposition. They both indicated that when F.M.K. discussed her allegations with them, she was clear and articulate, and at no point did either detect an inconsistency in her account despite multiple and repeated discussions of the subject over the course of their respective treatment sessions.[5]

To rebut the government's case, Dr. Compton testified that F.M.K.'s allegations were false. He described her as "flirtatious" and "manipulative," and expressed the view that it was not unusual for patients to have sexual fantasies about their therapists.[6] Dr. Compton also testified

---

5. Dr. Lazar testified as follows:

> The details of her story were remarkably consistent. She has a very clear and accurate memory and really never—I never found any inconsistencies, no matter when we discussed them.

Dr. Zinner similarly recounted:

> [F.M.K. and her husband] have been entirely consistent and unchanging in their rendition of what took place. There's never been any alteration or embellishment or exaggeration or change in they [sic] report the events.
> ...

> The descriptions have been very nuanced, as well, and the emotions that go along with the descriptions are completely appropriate to the situation.
> By nuanced, I mean that not exaggerated.

6. Dr. Compton's testimony with regard to F.M.K.'s fantasies revealed the following:

> [Dr. Compton]: [S]he told me things got so bad that as she was having sex with [her husband], she would suddenly feel like she was having sex with her father.
> And we talked a lot about that, about her hatred of her father, her distrust of her

that he believed F.M.K. was seeking revenge and monetary profit after she perceived that Dr. Compton had favored F.M.K.'s business partner during the time when Dr. Compton had been mentoring both of them during an earlier fledgling, and ultimately failed, partnership. He admitted, however, that a year after F.M.K.'s partnership efforts failed, he referred "a couple of very good clients to her in about 1995" because at the time he believed her to be a capable therapist. He further admitted that he would have continued to lend her his professional support had her allegations against him not surfaced. Un-

til that time, he said, it would have been reasonable for F.M.K. to have expected that he would continue to be a source of referrals. Dr. Compton also noted that at the time he dissolved his business relationship with Dr. Lynn in 1995, thus ending their joint couples therapy group, F.M.K.'s relationship with her husband appeared to be improving.

As it had announced before the hearing, the government called F.M.K. as a rebuttal witness to contradict limited portions of Dr. Compton's testimony. F.M.K. primarily denied ever having discussed her sexual fantasies with Dr. Compton. Defense

father, her feeling appalled with herself because she would have this incestuous, albeit very negative fantasy, and that was a piece of work.

I mean, we had to talk about that for months.

. . .

She substituted me in the fantasy for—

[Counsel]: Her father.

[Dr. Compton]: Her father.

[Counsel]: She told you that expressly?

[Dr. Compton]: Yes.

[Counsel]: And how did you deal with that?

[Dr. Compton]: I don't recall exactly, but it worked. She felt much better about being in bed with [her husband] and—

[Counsel]: You mean thinking that he was you?

[Dr. Compton]: Yeah. Every once in a while, she would flash on me, especially if her father would intrude himself into the bedroom. She would shoo him out with me. Now, what—

[Counsel]: Now, the question is how did you deal with that with her? When she disclosed that to you, how did you deal with it? I mean, did you encourage or preserve the sexualization of her relationship with you in order to get over this difficulty she was having with [her husband]?

[Dr. Compton]: No.

[Counsel]: Okay. Then how did you deal with it?

[Dr. Compton]: I dealt with it as I would deal with most any fantasy, pointing out the positive aspects of it on the one hand and

she was concerned about having me in there, into the fantasy.

I told her that's common. I mean, that is a common thing that happens with people who are in therapy. That didn't make her sick or ill or anything like that.

She—I didn't encourage it, but I certainly didn't make her feel like she was nutty for doing that.

The government later attempted to impeach Dr. Compton's foregoing testimony with his prior deposition in the 1997 civil suit:

[Gov't Counsel]: The question was propounded ... to you in your deposition[:] "Did [F.M.K.] ever talk with you in individual therapy about her sexual relationship with [her husband]?" Answer: "No. Not—I don't think she talked much about that. If she had, I would have been inclined to say, 'Why don't you bring that up with [your husband] in couples group.' That would be a standard response I would make. Yes." Do you recognize that question and that as your answer during the deposition?

. . .

[Dr. Compton]: Yes. That is correct.

[Gov't Counsel]: And that answer is inconsistent with what you've just told us, isn't that correct?

[Dr. Compton]: I don't think so.

. . .

[D]uring the time that she—she didn't talk about it much, but she talked about it some, and when she talked about it, she talked about these fantasies that she had about her father.

Those are not inconsistent.

counsel cross-examined F.M.K. following her direct testimony on rebuttal, but the scope of cross-examination was limited by the ALJ to matters raised on direct and to matters relevant to credibility generally.

### C. *The ALJ's Decision*

On October 15, 2002, the ALJ issued a recommended decision. Although the evaluation of F.M.K.'s testimony had been made difficult, according to the ALJ, by the government's reliance on her deposition testimony, he nonetheless credited her account over that of Dr. Compton. The ALJ noted three pieces of evidence tending to support her credibility: (1) F.M.K. had a strong pecuniary motive not to assert false charges against Dr. Compton because at the time she revealed her accusations to Dr. Lynn in the autumn of 1995, Dr. Compton had referred clients to her; (2) F.M.K. had a strong disincentive to level false charges against Dr. Compton because any such allegations would jeopardize her relationship with her husband, which, as Dr. Compton testified, appeared to him to have improved by October 1995; and (3) Drs. Zinner and Lazar "credibly testified that [F.M.K.] consistently adhered to her story of abuse at the hands of Dr. Compton during their years of treating her and that the details of her story have not changed." In contrast, the ALJ found Dr. Compton to be less credible because his testimony regarding F.M.K.'s sexual fantasies had been impeached by his prior deposition testimony, see note 6, *supra,* and because the manner in which Dr. Compton shredded a paper napkin on the witness stand indicated that he was uncomfortable with his testimony.

Having assessed the parties' comparative credibility, the ALJ found by a preponderance of the evidence that, over the course of his therapeutic relationship with F.M.K. and in the privacy of their sessions together, Dr. Compton: (1) engaged in sexual intercourse with F.M.K.; (2) often had her disrobe; (3) sucked her breasts; (4) kissed her neck; (5) held her and kissed her lips; (6) sat with her on his couch and held her with her head on his shoulder; and (7) made sexually suggestive remarks and invitations to her. Based on these factual findings, the ALJ concluded that Dr. Compton transgressed the prohibition on sexual harassment and exploitation of patients, thereby violating the standards of acceptable conduct and prevailing practice within his profession. The ALJ accordingly recommended that Dr. Compton's license to practice psychology in the District of Columbia be revoked because "no sanction less than revocation … provides an adequate assurance that other clients will not become victims of his disregard of the clear ethical mandates of his profession." The ALJ declined, however, to recommend the imposition of a civil fine pursuant to D.C.Code § 2-3305.14(c)(5).

The Board adopted the ALJ's findings of fact, conclusions of law, and recommendation to revoke Dr. Compton's license to practice psychology. The Board also fined Dr. Compton $5,000 in order to compensate the Department of Health for the costs it incurred in prosecuting the case, including the cost of transcripts which were supplied to him. The Board affirmed its order in a final decision rendered on November 22, 2002, from which Dr. Compton filed a timely petition for review with this court. *See* D.C.Code §§ 2-510, 3-1205.20 (2001). He asks that we reverse the revocation order and remand the case.

### II.

Like all administrative decisions, license revocations by the Board of Psychology must flow rationally from record facts rooted in "substantial evidence." *See*

D.C.Code § 2–510(a)(3)(E); *Donahue v. District of Columbia Bd. of Psychology,* 562 A.2d 116, 121 (D.C.1989). Substantial evidence exceeds a mere scintilla of proof; it means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Children's Def. Fund v. District of Columbia Dep't of Employment Servs.,* 726 A.2d 1242, 1247 (D.C.1999) (citing, *inter alia, Consol. Edison Co. v. Nat'l Labor Relations Bd.,* 305 U.S. 197, 229, 59 S.Ct. 206, 83 L.Ed. 126 (1938) (citations omitted)). Since the government's case rested exclusively on allegations of sexual misconduct with a patient and the Board revoked petitioner's professional license based primarily on F.M.K.'s sworn deposition, we must decide whether that hearsay evidence is "substantial evidence." [7] We conclude that the disputed hearsay evidence in this case was so central to the allegations of professional misconduct that, without more corroboration than was present here, the Board could not substantially rely on the deposition to support its decision to revoke Dr. Compton's license.

We are not presently concerned with the question of whether hearsay evidence is admissible in administrative proceedings—for clearly it is [8]—but rather, once duly admitted, whether and under what circumstances hearsay may constitute substantial evidence in support of administrative action. As a matter of first principles, we have repeatedly held that duly admitted and reliable hearsay may constitute substantial evidence. *See, e.g., Coalition for the Homeless v. District of Columbia Dep't of Employment Servs.,* 653 A.2d 374, 377–78 (D.C.1995) ("Hearsay found to be reliable and credible may constitute substantial evidence ...."); *Wisconsin Ave. Nursing Home v. District of Columbia Comm'n on Human Rights,* 527 A.2d 282, 288 (D.C.1987) (explaining that reliable hearsay standing alone may constitute substantial evidence); *Simmons v. Police & Firefighters' Ret. & Relief Bd.,* 478 A.2d 1093, 1095 (D.C.1984); *Jadallah v. District of Columbia Dep't of Employment Servs.,* 476 A.2d 671, 676 (D.C.1984); *see also Richardson,* 402 U.S. at 402, 91 S.Ct. 1420, 28 L.Ed.2d 842; *Hoska v. United States Dep't of the Army,* 219 U.S.App. D.C. 280, 287, 677 F.2d 131, 138 (1982). Thus, nothing in the hearsay nature of evidence inherently excludes it from the concept of "substantial" proof in administrative proceedings.[9]

■ Of course, just because hearsay may constitute substantial evidence does not be mean that it will do so in every

---

**7.** *See generally Puma v. Sullivan,* 746 A.2d 871, 875 (D.C.2000) (defining hearsay as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted"); *cf.* D.C.Code § 14–102(b)(1) (2001) (excepting sworn depositions from the definition of hearsay when "the declarant testifies at the trial or hearing and is subject to cross-examination concerning the [deposition] statement").

**8.** The legislature has made it clear that, unless it is irrelevant, immaterial, or unduly repetitious, hearsay is admissible in administrative proceedings. *See* D.C.Code § 2–509(b) (2001); *see also Gropp v. District of Columbia Bd. of Dentistry,* 606 A.2d 1010, 1014 (D.C.

1992) (citing, *inter alia, Richardson v. Perales,* 402 U.S. 389, 402, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971); *Gen. Ry. Signal Co. v. District Unemployment Comp. Bd.,* 354 A.2d 529, 531 (D.C.1976); *Wallace v. District Unemployment Comp. Bd.,* 294 A.2d 177, 179 (D.C.1972)).

**9.** The relaxed rules on the admissibility and competence of hearsay evidence in administrative proceedings reflect the ALJ's ability to assess properly the reliability and probative weight of hearsay evidence—an expertise less likely to be found in the average jury, toward which the traditionally rigorous rules of evidence are aimed. *See Jadallah,* 476 A.2d at 676.

case. The circumstances under which hearsay rises to the level of substantiality are not ascertained by any definitive rule of law, but rather by a set of considerations applied to the particular facts of each case. *See Robinson v. Smith,* 683 A.2d 481, 488–89 (D.C.1996) (citing *Washington Times v. District of Columbia Dep't of Employment Servs.,* 530 A.2d 1186, 1190 (D.C.1987) (stating that even hearsay "that lacks indicia of reliability may be entitled to some weight")). The weight to be given to any piece of hearsay evidence is a function of its truthfulness, reasonableness, and credibility. *See Wisconsin Ave. Nursing Home,* 527 A.2d at 288 (quoting *Johnson v. United States,* 202 U.S.App. D.C. 187, 190–91, 628 F.2d 187, 190–91 (1980)). We have said that

> [a]mong the factors to consider in evaluating the reliability of hearsay evidence are whether the declarant is biased, whether the testimony is corroborated, whether the hearsay statement is contradicted by direct testimony, whether the declarant is available to testify and be cross-examined, and whether the hearsay statements were signed or sworn.

*Id.; see also Gropp,* 606 A.2d at 1014 n. 10.

Petitioner advances the notion that although hearsay may constitute substantial evidence in some circumstances, under *Lim v. District of Columbia Taxicab Comm'n,* 564 A.2d 720 (D.C.1989), it can never constitute substantial evidence when it is contradicted by live sworn testimony and the declarant is available to take the witness stand. In *Lim* we said that an "administrative agency should not rely on hearsay to refute sworn testimony, when the party relying on the hearsay is able to call the declarant to the stand." *Id.* at 725 (citing *Jadallah,* 476 A.2d at 676). Respondent counters that this rule should not apply when, as here, the hearsay evidence relied upon is itself sworn. We reject both petitioner's categorical rule, and respondent's exception, for three reasons. First, both ignore that the availability of the declarant to testify at the hearing is a factor already built into the established test articulated in *Wisconsin Ave. Nursing Home,* 527 A.2d at 288, and repeatedly affirmed in our decisions since. *See Hutchinson v. District of Columbia Office of Employee Appeals,* 710 A.2d 227, 233 (D.C.1998); *Gropp,* 606 A.2d at 1014 n. 10. The ALJ expressly recognized this fact when he correctly allowed the government to undertake to prove its case through the deposition. Second, the proposed rule reads too much into *Lim* by converting "should not rely" into "must not rely." The rule petitioner advances is simply not found in the holding of *Lim,* where we affirmed the agency's reliance on hearsay despite having cited the (perhaps hyperbolic) cautionary warning in *Jadallah* because the record as a whole supported the agency's decision to credit the hearsay.[10]

---

10. Petitioner seizes upon language appearing in *Jadallah* and cited in *Lim* that superficially supports his thesis. In *Jadallah* we said,

> [i]t is one thing to hold that hearsay evidence is admissible at agency hearings, but quite another thing to say that the direct sworn testimony of a witness on a crucial fact can be effectively refuted by hearsay, *i.e.,* the statements of persons not produced as witnesses—and hence not subject to cross-examination—when the party relying on such statements is in a position to call the declarants to the stand.

476 A.2d at 676; *see also Lim,* 564 A.2d at 725 n. 10. Although this language might, at first blush, sweepingly suggest that hearsay derived from an available declarant may never constitute substantial evidence in the face of contradictory live testimony, it cannot be read in a vacuum or divorced from the holdings in the cases. We held in *Jadallah* that the hearsay at issue was too insubstantial to support the agency's action because the circumstances surrounding the hearsay made it particularly unreliable, and not because it

564 A.2d. at 724. Lastly, we have previously rejected attempts to invalidate agency findings "mechanically" for a lack of substantial evidence simply because the finding was based entirely on hearsay evidence contradicted by sworn testimony. *See James v. District of Columbia Dep't of Employment Servs.*, 632 A.2d 395, 398 (D.C.1993) (citing *Johnson*, 202 U.S.App. D.C. at 190–91, 628 F.2d at 190–91 (rejecting "a *per se* approach that brands evidence as insubstantial solely because it bears the hearsay label;" "instead ... evaluating the weight each item of hearsay should receive according to the item's truthfulness, reasonableness, and credibility")). The added fact of the declarant's availability in this case does not persuade us to reverse course and follow the path we have previously spurned for good reason. See note 9, *supra. But see Hutchinson*, 710 A.2d at 233 (assuming, "without deciding, that unavailability is required for the admission of prior testimony in administrative proceedings"). We again decline to adopt a categorical rule because the incremental concern arising from reliance on hearsay evidence when the declarant is available—just as the measure of reliability added by the fact that the hearsay has been given under oath—is to be taken into account in our existing balancing test.

### III.

▉ The weight to be accorded to hearsay evidence "range[s] from minimal to substantial based on a case-by-case evaluation of the reliability and the probative value of the evidence." *Jadallah*, 476 A.2d at 678 (Ferren, J., concurring); *James*, 632 A.2d at 398. Relying on a footnote in *Gropp*, 606 A.2d at 1014 n. 10, the ALJ determined that the reliability of F.M.K.'s deposition was diminished by (1) F.M.K.'s failure to testify in person during the government's case-in-chief despite being available to do so on rebuttal; (2) Dr. Compton's live testimony contradicting the deposition; and (3) the potential bias inhering in a deposition prepared in anticipation of a civil trial for damages. He nonetheless credited the deposition as being trustworthy because it was sworn and because it was corroborated by other evidence. According to the ALJ, "the corroboration of the hearsay statements and, in particular, [F.M.K.'s] disincentives to fabricate" constituted the "most important of the factors identified in *Gropp*" for purposes of resolving this case.

▉ "Although this court has adopted a flexible approach that rejects any rigid threshold requirement of competent corroborating evidence, 'administrative findings and conclusions based exclusively on hearsay [are subject] to exacting scrutiny,'"[11] *Lim*, 564 A.2d at 724 (citing *Martin v. District of Columbia Police & Firefighters' Ret. & Relief Bd.*, 532 A.2d 102, 109–10 n. 2 (D.C.1987)), and "reversal may be warranted if an agency places undue

was categorically excludable upon the occurrence of triggering conditions like those presently urged on appeal. 476 A.2d at 677. Indeed, Judge Ferren wrote a separate concurrence to emphasize that he understood the court's disposition to be grounded on the determination that the hearsay at issue was particularly unreliable. *See id.* (Ferren, J., concurring) (echoing criticism of the closely related and outmoded "residuum rule," which barred reliance on uncorroborated hearsay in any and all circumstances). Our

decision in *Lim* further confirms that petitioner's proposed rule is not rooted in *Jadallah*, or any other of our decisions for that matter. Thus, the court's dispositive reasoning in both *Lim* and *Jadallah* confirms the approach we have outlined anew in the text.

11. We are confident that F.M.K.'s deposition was at the core of the agency's order because, as we've already noted, Drs. Zinner's and Lazar's testimony was received in corroboration of the deposition.

confidence in hearsay evidence that is too unreliable to justify the weight given to it." *Id.* (citing *Martin*, 532 A.2d at 109 (citing *Jadallah*, 476 A.2d at 676–77)). This more stringent appellate review is proper because, unlike credibility determinations based on observation of a witness's demeanor, to which we ordinarily defer, *see, e.g., George Hyman Constr. Co. v. District of Columbia Dep't of Employment Servs.,* 498 A.2d 563, 566 (D.C.1985) ("[a] hearing officer's decisions are especially weighty when they involve credibility determinations"), the assessment of the reliability of hearsay evidence is limited to a review of the documentary record. Our examination of the corroboration relied upon to credit the hearsay evidence in this case leads us to conclude that F.M.K.'s deposition was given greater weight than warranted.[12]

We cannot agree with the ALJ that "the corroboration of the hearsay statements and, in particular, [F.M.K.'s] disincentives to fabricate" constituted the "most important of the factors identified in *Gropp*" for purposes of resolving this case. The ALJ confined his recitation of the law to a terse delineation of the elements that factor into the balancing test with respect to hearsay reliability,[13] but without due note of our cautionary warnings in *Lim* and *Jadallah*, which, although not carrying the preclusive force sought by petitioner, indicate that the absence of an available witness, should have been given significantly greater weight in the ALJ's deliberations. *See James*, 632 A.2d at 398 (citing *Jadallah*, 476 A.2d at 677 (Ferren, J., concurring) ("Absent some indicia of reliability, hearsay evidence alone should not be permitted to offset the sworn testimony of a witness and to constitute substantial evidence in support of an agency position")). We echo our previous warnings again today. Where, as here, the declarant is available to testify and be cross-examined, the practice of relying exclusively on hearsay is strongly discouraged and should be heavily weighted against the sponsoring party. In the ordinary administrative case, hearsay is generally disfavored because "[i]n all adjudicative proceedings, 'cross-examination and confrontation are the handmaidens of trustworthiness in the face of factual dispute.'" *Glenbrook Rd. Ass'n v. District of Columbia Bd. of Zoning Adjustment*, 605 A.2d 22, 39 (D.C. 1992) (quoting *Nat'l Trailer Convoy, Inc. v. United States*, 293 F.Supp. 634, 636 (N.D.Okla.1968)). Even though sworn cross-examined testimony can be a particularly reliable form of hearsay, cross-examination and confrontation were all the more critical here because the government built its case-in-chief solely on F.M.K.'s hearsay deposition, and, due to the private nature of allegations of sexual misconduct, credibility was the critical issue in this case.[14] Under the present circumstances where

12. We therefore need not address the two reasons given by the ALJ for discrediting Dr. Compton's testimony except to note that there is only slight record support for one of the reasons, that Dr. Compton testified inconsistently with respect to whether F.M.K. had talked in therapy sessions about her sexual relationship with her husband *per se,* as opposed to incidentally in connection with her ideation of incest. See note 6, *supra.*

13. The tenth footnote in *Gropp* states that [f]actors to consider in evaluating the reliability of hearsay evidence include: whether

the declarant is biased, whether the testimony is corroborated, whether the hearsay statement is contradicted by direct testimony, whether the declarant is available to testify and be cross-examined, and whether the hearsay statements were signed or sworn.
606 A.2d at 1014 n. 10 (citations omitted).

14. The ALJ stated that:

[t]he testimony of [F.M.K.] and Dr. Compton conflicts directly and irreconcilably concerning the central issue in this case—

the hearsay was directly contradicted by sworn and cross-examined testimony presented during the hearing, the absence of live testimony subject to cross-examination despite the availability of the declarant, compromised the ALJ's ability to resolve conflicting testimony, notwithstanding some corroboration supporting F.M.K.'s assertions. The importance of live testimony was driven home here where the ALJ decided to discredit Dr. Compton's testimony based partly on personal observation of his demeanor, yet decided to credit F.M.K.'s testimony based on the cold record, without having a similar opportunity to observe her demeanor on the stand. See note 18 *infra.* We do not say that exclusive reliance on disputed hearsay may never be appropriate where, even after heavily discounting the hearsay by the declarant's availability, the hearsay is proven to be reliable by strong corroboration.[15] Such was not the case here, however.

The ALJ determined that F.M.K. had a strong pecuniary motive not to assert false charges against petitioner because at the time she revealed her accusations to Dr. Lynn in the autumn of 1995, petitioner had already referred clients to her and she could have reasonably continued to expect similar benefits from their association. Assuming that F.M.K. in fact harbored such an expectation,[16] the risk from disclosure was minimal because her "muddled"

and "confused" revelations to Dr. Lynn were made in the course of a therapy session sealed by a duty of confidentiality—a fact of which she undoubtedly was aware given her status as a licensed counselor. At the time, F.M.K. did not follow-up on Dr. Lynn's request that she be permitted to report the allegations of sexual misconduct. Furthermore, even if F.M.K. had a pecuniary motive when she first made vague allegations to Dr. Lynn, the ALJ's reasoning does not extend to 1997, when F.M.K. gave the deposition which fleshed out in detail her accusations against Dr. Compton. It is the account contained in the deposition given in 1997— when she could no longer reasonably have had the presumed pecuniary motive—that needed to be tested. Moreover, the value to be placed on a pecuniary disincentive to file false charges on the basis of referrals of "a couple of [Dr. Compton's] very good clients" made in 1995 cannot be ascertained without consideration, not present here, of the potentially much larger incentive of a lucrative damages claim filed in 1997.

The ALJ also determined that F.M.K. had a strong disincentive to level false charges against Dr. Compton because the revelations jeopardized her improving marital relationship. This determination was based on Dr. Compton's testimony that at the time he dissolved his business relationship with Dr. Lynn in 1995, thereby ending the joint couples therapy group,

whether her allegations of sexual misconduct by Dr. Compton are true. As the parties have recognized from the outset, resolution of that factual dispute issue depends upon my assessment of [F.M.K.'s] and Dr. Compton's credibility.

**15.** For example, greater reliance on hearsay evidence may be appropriate despite the declarant's availability and direct contradiction in situations less extreme than the instant case where the declarant is not a central witness upon whose testimony the entire case

rests, unlike F.M.K., who for all intents and purposes, was the only complaining witness in the disciplinary proceedings who had first-hand knowledge.

**16.** We note that it was Dr. Compton who testified that it would have been reasonable for F.M.K. to expect that he would continue to refer patients to her had she not accused him of sexual misconduct. There is no testimony from F.M.K. on whether she expected he would do so, however, nor of the importance of those referrals to her.

he "could see that [the K.'s] were doing better than they had in previous years." While we do not question the logic of the inference as a general proposition, we do not think it was sufficiently grounded in the facts of this case. First, Dr. Compton's observations, without more, do not persuasively establish—for the purpose of corroborating F.M.K.'s deposition—that the marriage was in fact improving, or, most relevant, that F.M.K. perceived an improvement, such that it provided an actual disincentive to her to reveal the allegations. The record in this case, moreover, suggests an equally plausible, but contrary, inference. By the time F.M.K. swore her 1997 deposition, she and her husband had revealed to Drs. Zinner and Lazar in 1996 that their marital discord had arisen as a direct consequence of F.M.K.'s "revelation in the fall of 1995 that she had been sexually molested by Dr. Compton during the course of her therapy." Having placed the alleged abuse at the center of her marital problems, it could be argued that F.M.K. had an incentive to persist in her story regardless of its truth or falsity when she gave her deposition in 1997. The ALJ did not address this possibility.

Finally, the ALJ found corroboration in Drs. Zinner's and Lazar's credible testimony that F.M.K. "consistently adhered to her story of abuse at the hands of Dr. Compton during their years of treating her and that the details of her story have not changed." This finding suffers from a critical flaw of logic. As we have long noted in the analogous evidentiary context concerning the significance of prior consistent statements, "[r]epetition does not imply veracity." *Rowland v. United States,* 840 A.2d 664, 679 (D.C.2004) (quoting *Prophet v. United States,* 602 A.2d 1087, 1093 (D.C.1992)); *see also Reed v. United States,* 452 A.2d 1173, 1180 (D.C.1982). Although it is popularly thought that the liar will often stumble over the forgotten details of earlier deceits, it is also equally true that the liar may "consistently adhere to" a well-rehearsed untruth. This is not to suggest that we have an opinion on the truth or falsity of F.M.K.'s allegations, because we surely do not. Rather, we state only that consistent repetition is not a sufficient basis upon which to evaluate the reliability of testimonial evidence in administrative proceedings, hearsay or otherwise.[17]

We also note the absence of any discussion of evidence introduced by Dr. Compton that strongly suggests that F.M.K.'s personal credibility should have been more thoroughly examined. This is particularly important where the ALJ did not have the opportunity personally to assess her demeanor on the stand.[18] The record contains psychological test reports generated in an independent medical examination that was conducted in connection with the civil suit around the time when the deposition was sworn. These reports contain data relevant to the ALJ's assessment of credibility. For example, the reports reveal that (1) F.M.K. "has a stylistic tendency to use fantasy excessively;" (2) she is "prone to defensively substitute fantasy for reality in stress situations much more

---

17. The law recognizes an exception that permits the admission of prior consistent hearsay statements in order to rebut a charge of recent fabrication. *See* D.C.Code § 14–102(b)(2); *Warren v. United States,* 436 A.2d 821, 836–38 (D.C.1981). This was not, however, the purpose for which the ALJ relied on Klein's consistent repetition.

18. The ALJ expressly eschewed reliance on Klein's rebuttal testimony as a means of assessing her credibility as "she was called only to deny specific assertions made by Dr. Compton during his testimony" and her time on the witness stand was therefore of "limited assistance."

often than do most people;" (3) "[s]ome concern is warranted about the elevated incidence of perceptual inaccuracy;" and (4) F.M.K.'s personality includes histrionic traits. While we do not credit or discredit these reports as evidence of F.M.K.'s untrustworthiness, the ALJ should have done so as the fact finder, particularly when the ALJ specifically represented that his decision was based in part on the exhibits admitted into evidence.

## IV.

■ In the absence of corroboration strong enough to overcome the inference of unreliability flowing from F.M.K.'s availability to testify, petitioner's direct contradiction of her allegations against him, and the centrality of these hearsay allegations to the agency's decision, the hearsay deposition in this case did not constitute evidence sufficiently substantial to support the revocation of Dr. Compton's professional license to practice psychology in the District of Columbia.[19] Accordingly the revocation order is reversed on the present record and the case remanded for

further proceedings not inconsistent with this opinion. *See Hedgman v. District of Columbia Hacker's License Appeal Bd.,* 549 A.2d 720, 723 & n. 2 (D.C.1988) (indicating that a faulty administrative decision is ordinarily remanded to the agency for further proceedings except where a remand would be futile or merely academic, or where an improperly imposed suspension expires by the time the case is resolved on appeal); *cf. Vill. Books, Inc. v. District of Columbia Bd. of Appeals & Review,* 296 A.2d 613, 615 (D.C.1972) (vacating an order revoking a license to operate amusement machines without remanding to the agency because the record failed to show that there was any competent evidence upon which new findings justifying revocation could be predicated).

*So ordered.*

---

19. In a related claim, petitioner also argues that, as a consequence of the government's reliance on hearsay to establish its case-in-chief, he was denied procedural due process of law because he never had the opportunity to cross-examine F.M.K. on the allegations forming the basis of the revocation. *See generally Mathews v. Eldridge,* 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976). We reject this claim because petitioner waived his right to confront F.M.K. After F.M.K.'s deposition testimony was introduced in the government's case-in-chief in place of her live testimony, petitioner orally moved sometime between April 2 and 3, 2002 for approval to call F.M.K. to the witness stand during the case-in-defense. *Cf. Jenkins v. United States,* 500 A.2d 1019, 1021 (D.C.1985) (stating that "a hostile witness, an adverse party, or a witness identified with an adverse party may be interrogated by a leading question") (quoting 2 WRIGHT & MILLER, FEDERAL PRACTICE & PROCEDURE § 415 at 531–32 (1982)). Although oral argu-

ment on the motion was scheduled for April 9, 2002, the record dispositively reveals that petitioner expressly abandoned the request during a hearing on April 4, 2002. *Cf. Guzman v. United States,* 769 A.2d 785, 794 (D.C. 2001) (explaining that abandoning the opportunity "to call a witness crucial to one's case can be considered inconsistent with assertions of prejudice resulting from the absence of information which the witness could have provided"). The failure to call F.M.K. is immaterial to our preceding discussion of the sufficiency of the government's hearsay proof in meeting its burden of persuasion with substantial evidence. *See* 17 DCMR 4115.1 (1990).

Petitioner assigned as error additional due process claims in a section of his brief entitled, "Summary of the Argument," but presented no argument in the brief. We consider them abandoned. *See Keene v. United States,* 661 A.2d 1073 n. 1 (D.C.1995).