v.

**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY,**
**Respondent.**

**No. 09–AA–1049.**

District of Columbia Court of Appeals.

Submitted May 24, 2011.
Decided Nov. 17, 2011.

THOMPSON, Associate Judge:

The Office of Administrative Hearings ("OAH") found that petitioner R.B.[1] was ineligible for unemployment compensation benefits because he was terminated from his job with respondent United States Environmental Protection Agency ("EPA") for conduct that constituted "gross misconduct."[2] R.B. asserts that, in contravention of the unemployment compensation regulations, the OAH administrative law judge ("ALJ") improperly based her decision on "prior statements or written documents" without "other reliable corroborating evidence," Petitioner's Brief at 2 (quoting 7 DCMR § 312.10 (2006)), and that this evidence was insufficient to support a finding of misconduct. We agree that the ALJ failed (or, at least, failed explicitly) to consider the proscription of 7 DCMR § 312.10, and we therefore remand for the ALJ to reconsider, in light of that regulation and the other evidentiary problems discussed in this opinion, whether EPA met its burden of proving misconduct.

## I.

R.B. was employed as an Associate Special Agent in Charge within the Criminal Investigation Division in the EPA Office of Criminal Enforcement, Forensics and Training.[3] He worked out of the EPA offices in the District of Columbia, commuting on weekends to the home he shared with his wife and children in New Jersey. On August 31, 2009, EPA terminated him from his position for "Conduct Unbecoming a Law Enforcement Officer

R.B. filed a brief pro se.

Ronald C. Machen Jr., United States Attorney, and R. Craig Lawrence and Andrea McBarnette, Assistant United States Attorneys, filed a brief for respondent.

Before THOMPSON, Associate Judge, REID, Associate Judge, Retired, and STEADMAN, Senior Judge.

---

1. We have substituted initials for the names of petitioner and his wife to protect their privacy with respect to some of the personal matters described in this opinion.

2. 7 DCMR § 312.3 (2006).

3. That Division of EPA is responsible for "overseeing and investigating environmental crimes" and "assisting the prosecution of possible offenses under [various federal environmental] statutes."

and Lack of Candor." The termination followed an internal EPA investigation into allegations made by R.B.'s wife to Marlton, New Jersey police officers in November 2007, that resulted in R.B.'s arrest for "Criminal Sexual Contact in the Fourth Degree." After its internal investigation, EPA found that, on two occasions in November 2007, R.B. had "used force or coercion to attempt to have sexual relations with [his] wife" and that he was "not fully and truthfully forthcoming" in responding to EPA investigators' questions about the incidents. EPA removed R.B. from his job upon concluding that he had exhibited a lack of the "discipline, restraint, and good judgment" required of an agent authorized to bear firearms and that his lack of candor in connection with the internal investigation "compromise[d] [his] ability to testify, as witness, in criminal proceedings initiated by the Agency."

R.B. applied for unemployment compensation. After a Department of Employment Services claims examiner determined that R.B. was qualified to receive unemployment benefits, EPA appealed, and the matter went to a hearing before OAH on June 18, 2009. At the OAH hearing, EPA presented testimony from two witnesses (Douglas Parker, Deputy Director of EPA's Criminal Investigation Division, and Robert Devine, formerly a special agent inspector with EPA's Professional Integrity and Quality Assurance unit) who described what led to the agency's internal investigation; identified the reports and correspondence constituting the results of the investigation; and identified the transcripts, summaries, and audio- and videotapes of interviews upon which EPA had

relied in determining that R.B. engaged in the conduct for which he was terminated. R.B., who did not have counsel at the hearing, did not testify or present any witnesses, but told the ALJ in an opening statement that he did not commit gross misconduct, violate any agency policy, or provide false or inaccurate testimony.

Following the hearing, the ALJ issued a Final Order (the "Order") dated August 10, 2009. The ALJ "did not agree . . . that . . . R.B.'s conduct toward his wife was a 'disqualifying rule violation' " that disqualified him from receiving benefits (a determination that EPA has not challenged). However, the ALJ found that EPA had proved by a preponderance of the evidence that R.B. provided "misleading or untruthful information" to EPA "regarding the incidents of November 2007 with his wife."

EPA's hearing evidence of lack of candor consisted of transcripts of Marlton police officers' interviews with R.B.'s wife, A.B., on November 21, 2007 (EPA Exhibit 109 and an audiotape of the same, and Exhibit 110 and a videotape of the same) and the transcript of EPA investigators' interview of R.B. on June 12, 2008 (EPA Exhibit 111, and an audiotape of the same). As transcribed in Exhibit 109, A.B. (who did not testify at the OAH hearing) described to the Marlton police two incidents (one on November 7, 2007 and the other on November 21, 2007) in which R.B. attempted to engage her in sexual relations and persisted in his efforts despite what she said were her protests or admonitions to "stop" (or "something to that effect").[4] During his interview by

---

4. The incidents came to the attention of the Marlton police because, during the second incident, R.B. attempted to have sex with A.B. when she was lying in the family room of their home on a sectional sofa. A.B. told police that "[f]rom all of the pushing and

stuff" that occurred, the sofa "cushion . . . started working its way from underneath [A.B.]" and her "tailbone hit the wooden part of the sofa." When she went to the hospital emergency room for treatment of her resultant injury, hospital personnel summoned the

EPA investigators, R.B. did not deny attempting to have sexual relations with his wife on the dates in question, and he acknowledged that she fell and hit her back during the encounter on November 21, but he told the investigators that he and A.B. did not struggle and that no force was involved.

Citing repeatedly to EPA Exhibits 109 and 111, and comparing several statements by A.B. to the Marlton police (transcribed in Exhibit 109) to statements by R.B. to the EPA investigators (transcribed in Exhibit 111), the ALJ found that R.B. "made [to EPA investigators] untruthful statements regarding his wife's emotional state and his wife's decision not to have sexual relations." The ALJ found "the statements made by [R.B.'s] wife in the interview of November 21, 2007, to be credible." The ALJ acknowledged that, in an interview by EPA investigators on June 17, 2008 (summarized in EPA Exhibit 119, but not transcribed), A.B. gave answers that differed from those she gave to the Marlton police. Specifically, A.B. reportedly told the EPA investigators that certain "things were miscommunicated" in her interviews with the Marlton police and that "nothing was done against [her] will." Exhibit 119 at 2. However, the ALJ discredited these reported statements, reasoning that the recantation reflected A.B.'s "concern[ ] with the possibility of her husband losing his job."

The ALJ concluded that by his lack of candor to EPA investigators, R.B. "demonstrate[d] a willful violation of Employer's interests and standards of behavior that an employer has a right to expect of its employees and, therefore, constituted gross misconduct." The ALJ concluded that R.B. therefore was "disqualified from receiving unemployment compensation benefits." This petition for review followed.

## II.

■ We review decisions of the OAH to determine whether they are "[a]rbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *District of Columbia Dep't of Emp't Servs. v. Vilche*, 934 A.2d 356, 360 (D.C.2007); *see* D.C.Code § 2–510(a)(3)(A) (2001). We are bound by OAH's "[f]actual findings supported by substantial evidence on the record as a whole," even if we "may have reached a different result based on an independent review of the record." *McKinley v. District of Columbia Dep't of Emp't Servs.*, 696 A.2d 1377, 1383 (D.C. 1997) (citation omitted). "Substantial evidence is 'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.' " *Chase v. District of Columbia Dep't of Emp't Servs.*, 804 A.2d 1119, 1123 (D.C.2002); *see also* 7 DCMR § 308.2 (providing that unemployment compensation decisions "shall be supported by findings of fact based on evidence which is reliable, probative, and substantial").

■ Under the District of Columbia unemployment compensation program, a person who is discharged from his job for "gross misconduct" is not eligible to receive unemployment compensation benefits until after the passage of a substantial waiting period. *See Odeniran v. Hanley Wood, LLC*, 985 A.2d 421, 422 (D.C.2009) (citing D.C.Code § 51–110(b) (2001) and 7 DCMR § 312.3). The employer has "the

police to investigate possible domestic violence. R.B. eventually was charged with sexual assault on the basis of that incident, but the charges were dismissed in municipal court. The Burlington County Prosecutor concluded that there was "insufficient corroborating evidence to demonstrate that any sexual activity between the couple was not consensual or involved the knowing and purposeful use of physical force."

responsibility to present evidence sufficient to support a finding of misconduct...." 7 DCMR § 7–312.2; *see also Washington Times v. District of Columbia Dep't of Emp't Servs.*, 724 A.2d 1212, 1218 (D.C.1999); 7 DCMR § 312.8 ("The absence of facts which affirmatively establish misconduct shall relieve a claimant from offering evidence on the issue of misconduct."). While nothing "inherently excludes [hearsay] from the concept of 'substantial' proof in administrative proceedings," *Compton v. District of Columbia Bd. of Psychology*, 858 A.2d 470, 476 (D.C.2004), "administrative findings and conclusions based exclusively on hearsay are subject to exacting scrutiny." *Washington Post v. District of Columbia Dep't of Emp't Servs.*, 675 A.2d 37, 44 (D.C. 1996) (citation omitted). Further, the unemployment compensation regulations are even more demanding with respect to misconduct hearings, placing a stress on live testimony by the persons who have alleged misconduct and on the discharged employee's opportunity to question them. *See, e.g.,* 7 DCMR § 312.9 ("In an [unemployment compensation] appeal hearing, the persons who ... issued ... statements alleging misconduct shall be present and available for questioning by the adverse party."). Of particular significance in this case, 7 DCMR § 312.10 provides that "[i]n an appeal hearing, prior statements or written documents, in the absence of other reliable corroborating evidence, shall not constitute evidence sufficient to support a finding of misconduct by [OAH]."

The inquiry before OAH, and before this court, in an unemployment compensation case is not whether the employer's rationale for terminating the employee was reasonable or sufficient. *See, e.g.,*

*Benjamin v. Wash. Hosp. Ctr.*, 6 A.3d 263, 269 (D.C.2010) ("We are not suggesting in any way that the employer's actions in enforcing its rules were not reasonable."). Rather, for there to be substantial evidence of misconduct that disqualifies a claimant for unemployment benefits, there must be evidence supporting an inference that the terminated employee "intended to engage in wrongdoing." *Jadallah v. District of Columbia Dep't of Emp't Servs.*, 476 A.2d 671, 676 (D.C.1984). OAH's determination that an employee committed misconduct is to be a *de novo* determination made in accordance with the unemployment compensation regulations. *See Benjamin*, 6 A.3d at 269–70 (noting that it was OAH's responsibility to make a *de novo* determination as to whether claimant was terminated for willful or deliberate acts that constituted misconduct).

## III.

As described above, central to the ALJ's finding that R.B. made untruthful statements to his employer's investigators was a comparison of A.B.'s statements to the police to R.B.'s statements to the EPA investigators.[5] The ALJ's task, however, was not to determine whether EPA had a reasonable basis for concluding that R.B.'s statements conflicted with A.B.'s account. Instead, the ALJ was to determine *de novo* whether R.B. was intentionally untruthful when he told his employer's investigators that he did not use force in an attempt to have sex with A.B. Relying on 7 DCMR § 312.10, R.B. contends that the ALJ could not do this merely by comparing A.B.'s interview statements to his statements, because A.B.'s statements were unaccompanied by what the regulation requires: "other ... corroborating ev-

---

**5.** The ALJ's Order contains tables juxtaposing several of A.B.'s and R.B.'s statements.

idence."[6] Petitioner's Br. at 2, 3 (arguing that A.B.'s account "cannot by itself be the basis for an adverse ruling" on his claim for unemployment benefits).

We agree with R.B. that the ALJ could not lawfully rely exclusively on A.B.'s statements to determine whether R.B. responded dishonestly to his employer's investigation questions. As 7 DCMR § 312.10 establishes, "in the absence of other reliable corroborating evidence," A.B.'s prior statements—which were central to EPA's case—did "not constitute evidence sufficient to support a finding of misconduct."[7] The ALJ did not refer to § 312.10, and if she relied upon other "corroborating evidence" as it requires, she did not say so in her Order. We note also that the issue of corroboration in this case was complicated by the subject matter. As the EPA investigators told R.B., "Now, you said you didn't try to force yourself on her *but that could be a matter of interpretation* ..." (emphasis added). In concluding that R.B. responded dishonestly to the EPA investigators' questions about whether he used force against A.B., the ALJ appears not to have considered whether R.B.'s responses, although in conflict with A.B.'s initial statements, might have reflected his honest interpretation of what occurred.[8]

An additional problem with exclusive reliance on A.B.'s prior statements (if that is what occurred) is that A.B.'s statements were unsworn, were not cross-examined when made, and could not be cross-examined at the hearing.[9] *See*

---

6. In his *pro se* post-hearing brief submitted to OAH, R.B. asserted repeatedly that EPA was relying on A.B.'s transcribed statements (Exhibits 109 and 110), complained about the "hearsay" nature of EPA's evidence, and argued that the ALJ should not give weight to the termination notice (Exhibit 104) written by an individual who was "not an eyewitness to any event" (and who did not testify at the hearing). We think these assertions about the insufficiency of EPA's evidence were enough to "preserve[ ] [R.B.'s § 312.10] argument for appellate consideration even though he failed to invoke it by name" during the OAH proceedings. *Gaffney v. United States*, 980 A.2d 1190, 1194 n. 9 (D.C.2009). We note that EPA's counsel likewise did not specifically cite § 312.10, but did tell the ALJ that this was "not a case where we're simply relying on a written statement because we also have the advantage here of an actual video and audio recording of the witness." That statement, too, should have alerted the ALJ to consider the requirements of § 312.10.

7. *Cf. Compton*, 858 A.2d at 476 (reasoning that "the disputed hearsay evidence in this case was so central to the allegations of ... misconduct that, without more corroboration than was present here, the Board could not substantially rely on the [complainant's] deposition to support its decision to revoke [the doctor's] license"); *In re Jam.J.*, 825 A.2d

902, 915 (D.C.2003) ("[T]he potential importance ... of being able to elicit ... live testimony is heightened where ... the proof ... depends critically on the admission of accusatory statements ... made outside of the courtroom."); *see also Gaffney*, 980 A.2d at 1194 (explaining that in a criminal prosecution for perjury, there needs to be at least "one witness plus independent corroborative evidence" of "the part of the primary witness's testimony that falsifies the defendant's statement").

8. R.B. argues that "[a]bsolutely no evidence had been presented to show that the petitioner tried to deceive anyone much less provide false or misleading testimony." Notably, in her statement to the Marlton police, A.B. stated that R.B. "would never see [what occurred on November 21] as rape or a sexual assault." Further, she told the officers that R.B. just didn't "get it"; she suggested that R.B. viewed her lying down as "like an invitation that I want you to bother me"; and she described their relationship as one in which he cajoled her for sex and in which she sometimes "just like let him so that he would go away."

9. And, of course, none of EPA's witnesses at the OAH hearing had first-hand knowledge of what transpired between R.B. and A.B. during the incidents in question; they, and all of

*Compton*, 858 A.2d at 477 ("[A]mong the factors to consider in evaluating the reliability of hearsay evidence are whether ... the testimony is corroborated, ... whether the declarant is available to testify and be cross-examined, and whether the hearsay statements were signed or sworn."). This was the case notwithstanding 7 DCMR § 307.10(c), which provides that each party at an unemployment compensation hearing has the right to conduct cross-examination "as may be required for a full and true disclosure of the facts." [10] This problem was compounded by the fact that some of the police officers' questions to A.B. were quite leading or suggestive.[11]

Another problem with the ALJ's reliance on A.B.'s testimony as the measure of truth in this case is that the ALJ had only an audiotape of A.B.'s first interview (the more lengthy of her two interviews) by Marlton police, and had neither an audio- tape nor videotape (and also had no transcript) of the interview by EPA investigators in which A.B. recanted the claims of force she made in her interviews with the Marlton police. Thus, in judging credibility, the ALJ had only a limited opportunity to observe A.B.'s demeanor and to listen to her tone of voice.[12]

In addition, the issue of whether R.B. was intentionally dishonest with his employer was complicated by the very "private nature" of the questions that the investigators asked him. *Compton*, 858 A.2d at 479 (noting that "due to the private nature of allegations of sexual misconduct, credibility was the critical issue"). The EPA interviewers not only interrogated R.B. about whether he had used force against his wife during the two incidents in November 2007, but also questioned him more generally about his intimate relation-

the EPA personnel who were involved in the internal investigation and the termination decision, relied entirely on A.B.'s unsworn statements to the Marlton police officers. *Cf. Compton*, 858 A.2d at 480 n. 15 (explaining that "greater reliance on hearsay evidence may be appropriate ... in situations ... where the declarant is not ... the only complaining witness ... who had first-hand knowledge").

10. *See also* 7 DCMR § 312.9, which, as already noted, provides that "[i]n an [unemployment compensation] appeal hearing, the persons who ... issued other statements alleging misconduct shall be present and available for questioning by the adverse party." Although it was not A.B. (but instead EPA officials) who alleged "lack of candor," A.B.'s statements were central to their charge that R.B. was untruthful to EPA investigators. We note in addition that R.B. was not given an opportunity to hear or read A.B.'s statements to police before EPA investigators interviewed him about the November 2007 incidents on June 12, 2008.

11. For example, A.B. told the Marlton police interviewers at one point that R.B. was "pushing up against me." The interviewer responded, "Kind of like, for lack of a better word, somebody just grinding up on you?" A.B. agreed, and thereafter, describing what transpired after she fell and hurt her back and R.B. offered to get her a heating pad and massaged her back, she adopted the interviewer's word, telling the interviewer that R.B. "started ... grinding up against me" again. As another example, the officers began the videotaped interview of A.B. (transcribed as Exhibit 110) with a statement about her rights "as a victim of domestic violence."

12. We also note that at least one of the purportedly conflicting statements that the ALJ cited as showing that R.B. gave untruthful answers to the EPA interviewers "regarding his wife's emotional state," Order at 5, appears to have been taken out of context or to reflect a miscommunication between R.B. and the interviewers. The ALJ highlighted A.B.'s statement about being "very angry" at the time R.B. went upstairs after the November 21 incident, Order at 6, but Exhibit 109 shows that R.B.'s statement about his wife's mood when he went upstairs (to which the ALJ compared A.B.'s statement) was a statement about A.B.'s mood when R.B. "first came home."

ship with his wife.[13] R.B. responded to many of the interviewers' question in quite intimate detail, but the interviewers reassured him at one point that they were "not trying to pry." In accepting EPA's claim that R.B. intended to engage in wrongdoing by not being "fully ... forthcoming" in response to the investigators' questions, the ALJ appears not to have considered whether R.B. had the prerogative to withhold (against prying) personal information that did not relate directly to the incidents under investigation.[14]

For all the foregoing reasons, we cannot affirm the ALJ's ruling on the present record. We conclude that a remand is in order, so that the ALJ may (1) explicitly consider and apply 7 DCMR § 312.10, (2) explain what if any "other reliable corroborating evidence" (beyond A.B.'s statements to the Marlton police) supports a finding that R.B. gave untruthful answers during his interview with the EPA investigators,[15] and (3) determine whether EPA proved by a preponderance of the evidence that R.B. "intended to engage in wrongdoing" in responding to the investigators' questions.

*So ordered.*

13. For example, the interviewers pressed R.B. about statements A.B. had made "not related to that specific incident," including her statements about the couple's not "sleeping together" and "not sharing the same bed."

14. *Cf. Bradley v. Veterans Admin.*, 900 F.2d 233, 237–38 (Fed.Cir.1990) (reasoning that a misrepresentation that an employee made to his employer in order to maintain his privacy regarding his personal life was not a material misrepresentation amounting to willful falsification).

15. *See Compton*, 858 A.2d at 474, 475, 479–80 (holding that there was inadequate corroboration of the complainant's out-of-court allegations even though the government called the complainant as a rebuttal witness (making her subject to limited cross-examination), even though two other witnesses testified that the complainant discussed her allegations with them and that they detected no inconsistency in her account despite multiple discussions of the subject, and even though the hearing officer reasoned that the complainant had strong motives not to lie); *James v. District of Columbia Dep't of Emp't Servs.*, 632 A.2d 395, 397 (D.C.1993) (holding that written disciplinary action reports plus the testimony of one of the employer's representatives who had "personal knowledge ... of three of the infractions on which the examiner expressly relied" were sufficient proof upon which to uphold the judgment of the hearing examiner).